**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **MICHAEL HOLLERICH and** | ) | |
| **LAURA HOLLERICH,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 1:14-CV-10411** |
| **v.** | ) | |
| | ) | **Jury Trial Demanded** |
| **ROBERT C. ACRI, KENILWORTH ASSET** | ) | |
| **MANAGEMENT, LLC, QUENTIN WOODS** | ) | |
| **CORPORATION, JOAN DESOUZA,** | ) | |
| **PRAEDIUM DEVELOPMENT CORP., KAM** | ) | |
| **PRIVATE FUND, LLC**, **WOODMAR** | ) | |
| **HAMMOND, LLC, and PRAIRIE COMMON** | ) | |
| **HOLDINGS LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## COMPLAINT

Plaintiffs Michael Hollerich and Laura Hollerich ("Plaintiffs" or the "Hollerichs"), by and through their undersigned attorneys, complain of defendants Robert C. Acri ("Acri"), Kenilworth Asset Management ("Kenilworth"), Quentin Woods Corporation ("QWC"), Joan DeSouza ("DeSouza"), Praedium Development Corp. ("Praedium"), KAM Private Fund, LLC ("KAM Private Fund"), Woodmar Hammond, LLC ("Woodmar Hammond"), and Prairie Common Holdings LLC ("Prairie," and collectively "Defendants"), as follows:

### Nature of the Action

1.     This action arises from the Plaintiffs' investment of $175,000 in two (2) investments recommended by their registered investment advisers, Acri and Kenilworth, through securities in the form of promissory notes. As a result of Acri's conduct as a registered investment adviser and managing member of Kenilworth, Acri has since been suspended and

barred by the Securities and Exchange Commission ("SEC"), the Financial Industry Regulatory Authority ("FINRA"), and the Illinois Secretary of State.

2.      Acri described these investments as real estate development projects that would provide the Hollerichs with a better rate of return than they could then obtain in the market. Despite their substantial financial investment and various promises that such investments would bear annual rates of interest and be secured by real estate, Plaintiffs received none of the promised benefits. Indeed, Defendants failed to provide any statements regarding the health (good or bad) of these investments, despite numerous requests for such information by the Plaintiffs.

3.      Specifically, based on the misrepresentations made by Acri, the Hollerichs invested $25,000 in Prairie, Woodmar Hammond and Praedium related to the development of a parcel of land near Hammond, Indiana (the "Woodmar Project"). Acri told the Hollerichs that the promissory note related to the investment would bear an annual interest rate of 15% and would be secured by an interest in certain real estate. Acri further asserted that this promissory note for the Woodmar Project held a greater than 50% loan-to-value ratio, indicating that the Woodmar Project was a very low risk investment. The Hollerichs never received any interest payments and neither Acri nor any of the other defendants took any steps to obtain the promised security interests.

4.      In connection with the Woodmar Project, Acri and certain of the other Defendants failed to disclose the financial difficulties faced by Praedium and one of its principals, Doug Gannett ("Gannett"), including that Praedium was delinquent on the payment of its mortgage, property taxes, and certain contractor invoices. Acri also failed to disclose his personal relationship with Gannett and Praedium, that one of the primary purposes of the securities sold to

the Hollerichs (and others) was to give other Kenilworth clients who previously invested in Woodmar Hammond by way of the KAM Private Fund an opportunity to recover on their earlier investments in the Woodmar Project, or that Kenilworth would receive a five percent (5%) commission on the sale of these notes. Moreover, Acri misappropriated certain of these funds for his own private use.

5.     Acri also convinced the Hollerichs to invest in QWC in the amount of $150,000. Although the promissory notes related to QWC bore an interest rate of 20%, were to be secured by an interest in real estate and provided the Hollerichs with other forms of security, the Hollerichs received none of the promised consideration from QWC; nor the statements or other documentation required by the operative agreements. Acri failed to inform the Plaintiffs that certain of their investments would be used to pay back taxes and that QWC was having difficulties obtaining the requisite municipal approval for the planned used of QWC real estate.

6.     Indeed, Acri stated the exact opposite. Acri stated that he (and presumably QWC) had a lobbyist working on his behalf with the Village of Palatine in order to obtain zoning approval for an assisted living facility, the proposed development for which QWC was purportedly formed. Acri even referenced another project that was pursuing a similar zoning approval and represented that QWC was in better shape than the other project and that QWC would get zoning approval by the end of 2012. On information and belief, Acri misrepresented the status of the permitting process and the actions purportedly taken on behalf of QWC in this regard.

7.     Acri's modus operandi with respect to QWC was the same as that for the Woodmar Project. In short, the investments offered by Acri and sold to the Hollerichs related to QWC and the Hammond Project were a Ponzi scheme engineered by Acri to benefit himself and

the other defendants and to repay earlier investors by giving the appearance that their investments were bearing fruit. As a result, Plaintiffs bring claims under the Investment Advisers Act and the Exchange Act, as well as various common law claims.

## Parties

8.      Plaintiff Michael Hollerich is a citizen of the State of Illinois and a resident of Winnetka, Illinois within this judicial district.

9.      Plaintiff Laura Hollerich is a citizen of the State of Illinois and a resident of Winnetka, Illinois within this judicial district.

10.     Defendant Robert C. Acri, on information and belief, is a resident of Winnetka, Illinois and an attorney licensed to practice law in the State of Illinois. He was the founder, co-owner, and manager of Kenilworth until July 2012, when he resigned as a principal of Kenilworth and terminated his ownership thereof.

11.     Defendant Kenilworth Asset Management, LLC, on information and belief, is an Illinois limited liability company with its principal place of business in Kenilworth, Illinois. Kenilworth was formed in 2002 and is an investment adviser registered with the SEC.

12.     Defendant KAM Private Fund, LLC, is an Illinois limited liability company with its principal place of business in Kenilworth, Illinois. KAM Private Fund was administratively dissolved by the State of Illinois in May 2007; however, Acri continued to operate it until approximately 2012.

13.     Defendant Quentin Woods Corporation is an Illinois corporation with its principal place of business in Kenilworth, Illinois. Acri is, on information and belief, president and a shareholder of QWC.

4

14.     On information and belief, defendant Joan DeSouza is an Illinois citizen and a resident of this judicial district.

15.     Defendant Praedium Development Corporation is an Illinois corporation with its principal place of business in Northbrook, Illinois.

16.     Defendant Woodmar Hammond, LLC is an Illinois limited liability company, which was involuntarily dissolved in July 2013, with its principal place of business in Northbrook, Illinois.

17.     Defendant Prairie Common Holdings LLC is an Illinois limited liability company, with its principal place of business in Northbrook, Illinois.

**Jurisdiction and Venue**

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the Hollerichs' claims under the Investment Advisers Act and the Exchange Act constitute federal questions.

19.     This Court has supplemental jurisdiction over the Hollerichs' claims arising under state law pursuant to 28 U.S.C. § 1367 as they form part of the same transaction or occurrence as the Plaintiffs' other claims.

20.     This Court has personal jurisdiction over the Defendants because they are residents of this judicial district.

21.     Venue in this Court is proper pursuant to 28 U.S.C. § 1367(b) because Defendants are residents of this district and a substantial part of the events giving rise to the claims asserted herein occurred in this district.

## Facts Giving Rise to the Complaint

22. In or about 2002, Acri created Kenilworth, an SEC registered investment adviser. Acri was an attorney and registered investment adviser with the SEC at all times relevant to the allegations in this Complaint.

23. At all times relevant to the allegations in this Complaint, Acri controlled Kenilworth. As Kenilworth's founder and one of its managing members, Acri controlled its bank accounts, hired its employees, and made significant decisions concerning the investments offered to its clients and Kenilworth's policies and practices.

24. KAM Private Fund was an Illinois limited liability company formed in 2004 as a private pooled investment vehicle not registered with the SEC. KAM Private Fund was administratively dissolved by the State of Illinois in May 2007; however, Acri continued to operate it until approximately 2012.

**A.    The Woodmar Project and Acri's Friend Face Financial Difficulties**

25. In January 2005, Acri, as the founder and adviser to KAM Private Fund in which several Kenilworth clients were or later became investors, invested $500,000 of the KAM Private Fund's assets in a one-year promissory note issued by Praedium bearing 15% interest. Praedium is a real estate development company controlled by Acri's friend, Gannett, and one other person. The purported purpose of KAM Private Fund's investment was to provide funds to Praedium for use by Woodmar Hammond, an entity created by Praedium to redevelop a retail shopping center near Hammond, Indiana.

26. The Woodmar Project, however, struggled moving forward following this initial investment. Praedium ultimately failed to make any payment on the $500,000 promissory note issued to KAM Private Fund or the Kenilworth clients that had invested in the project.

6

27.     The economic and real estate downturn of 2008-09 further increased Praedium and Woodmar Hammond's financial distress by making it difficult for them to secure leases from prospective tenants and to obtain financing, including the promised tax increment financing from the City of Hammond, Indiana upon which the economic viability of the Woodmar Project depended. As a result, Praedium and Woodmar Hammond became delinquent on a mortgage, the payment of its property taxes, and the payment of some of its contractors.

28.     As a potential way forward, Praedium devised a plan in which two smaller parcels would be separated and developed so as to create equity in the larger Woodmar Project and demonstrate that progress was being made overall. To accomplish this plan, Praedium created two new companies, including Prairie, to own and develop the two smaller parcels.

29.     Praedium required financing to advance the Prairie project, but was unable to obtain the required funding from banks or other traditional lenders. Mr. Garrett, Acri's friend and a principal of Praedium, turned to Acri for assistance in finding investors to supply the necessary funding.

30.     Also in 2005, QWC was incorporated in Illinois as a real estate development and holding company. Acri is currently identified as the agent for QWC on the Illinois Secretary of State website.

**B.      Acri Convinces Hollerichs to Invest in Woodmar Project**

31.     In or about 2009, at the urging of Acri, the Hollerichs transferred a large portion of their assets to Kenilworth and under Acri's management. As their investment adviser, the Hollerichs looked to Acri to exercise sound judgment in accord with his fiduciary duties to them in recommending and placing investments on the Hollerichs' behalf. Prior to the Woodmar Project, all of the Hollerichs' investments were cleared through Raymond James.

32. In or about late March and early April 2011, in his capacity as their registered investment adviser, Acri recommended to the Hollerichs an investment in a retail parcel located near Hammond, Indiana. Acri offered to sell the Hollerichs promissory note securities of Prairie.

33. Acri stated that the Hollerichs' promissory note would be used in the development of a retail parcel located near Hammond, Indiana, had a more than 50% loan-to-value ratio, would be secured by certain real estate, and bore an 15% annual interest rate. Acri, however, did not identify whether the promissory note was issued by Praedium, Woodmar Hammond or Prairie and failed to provide the Hammonds with a copy of the proposed or executed promissory note.

34. Based upon Acri's representations and recommendation, the Hollerichs agreed to invest $25,000 in the Woodmar Project by way of a promissory note (the "Woodmar Agreement"). Specifically, on or about April 8, 2011, Laura Hollerich executed a check request to Raymond James directing it to send a check in the amount of $25,000 to Kenilworth to facilitate this investment.

35. Despite demands from the Hollerichs, Acri never provided the Hollerichs with a copy of the promissory note evidencing their investment in the Woodmar Project. In response to further requests for such documentation and other information with respect to this investment, after he left Kenilworth, Acri told the Hollerichs that the promissory notes were located at Kenilworth.

36. Unknown to the Hollerichs, the economic viability of the Woodmar Project was suspect, at best. Acri failed to disclose the true financial status and the difficulties facing the Woodmar Project at the time of the Hollerichs' investment. Specifically, Acri failed to inform

the Hollerichs that Praedium and the Woodmar Project had become delinquent on a mortgage, payment of property taxes, and invoices due to some of its contractors.

37.     Acri also failed to disclose to the Hollerichs that Praedium had failed to make any payments on its $500,000 promissory note issued to the KAM Private Fund. Indeed, Acri failed to inform the Hollerichs that one of the primary purposes for selling promissory notes with respect to the Woodmar Project in 2011 to Kenilworth clients, including the Hollerichs, was to give other Kenilworth clients, *i.e.*, those who had invested in the KAM Private Fund, a chance to recover on their earlier investments.

38.     In other words, Acri and Kenilworth solicited the Hollerichs and other Kenilworth clients in 2011 to invest in the Woodmar Project as part of a Ponzi scheme. Strapped for funds, Praedium turned to Acri for additional monies for the Woodmar Project, who in turn sold promissory notes in the Woodmar Project to the Hollerichs and several other Kenilworth clients.

39.     Acri and Praedium agreed that Kenilworth would receive a five percent (5%) commission on the sales of Woodmar Project promissory notes. Acri failed to disclose to the Hollerichs the commission that Kenilworth would receive upon the sale of these notes.

40.     Specifically, between April and September 2011, Acri and a Kenilworth associate offered and sold a total of $240,000 in promissory notes to six (6) Kenilworth clients, including the Hollerichs. On information and belief, Acri drafted these notes, which bore a 15% annual interest rate and stated maturities of approximately six (6) to eight (8) months.

### C.     Acri Convinces Hollerichs to Invest in QWC

41.     In or about early 2012, the Hollerichs approached Acri as their financial adviser seeking advice with respect to alternative investments that would provide a better rate of return than available in the market. Acri recommended that the Hollerichs invest in QWC, explaining

9

that the parcel of land would be used to develop an assisted living facility in the Village of Palatine, Illinois.

42.     Acri explained that the location of the parcel of land owned by QWC was in desperate need of such a facility given its close proximity to no less than three (3) hospitals. Acri further explained that the area where the land was located was a large population center that was underserved in the area of assisted living facilities. Acri told the Hollerichs that the facility would focus on patients with Alzheimer's and those in need of other memory-loss care.

43.     Acri told the Hollerichs that QWC had building plans drawn up and actually showed those plans to Mr. Hollerich. Acri explained that the only obstacle was the zoning permit, which he stated was close to being granted. Acri stated that he had a developer lined up who specialized in such facilities and who would build and then run the planned facility for QWC. Acri explained that, upon completion of the facility, the Hollerichs would have the option of receiving payment in full (including contractual interest) on their promissory notes or to convert their investment into an ownership stake in the facility, which would provide residual income as equity owners in the business.

44.     In or about April 2012, Michael Hollerich, through the Michael Hollerich IRA, entered into a Note and Purchase Agreement with QWC (the "MH-QWC Agreement"). (A true and correct copy of the MH-QWC Agreement is attached hereto as Exhibit A.)

45.     On that same date, Laura Hollerich, through the Laura Hollerich IRA, entered into an identical Note and Purchase Agreement with QWC (the "LH-QWC Agreement," and collectively with the MH-QWC Agreement, the "QWC Agreements"). (A true and correct copy of the LH-QWC Agreement is attached hereto as Exhibit B.)

46.     Pursuant to the QWC Agreements, the Hollerichs each agreed to lend QWC $75,000, for total of $150,000. (Ex. A at 1; Ex. B at 1.) In exchange, QWC agreed to (a) transfer to the Hollerichs a 25% ownership interest in QWC; (b) provide the Hollerichs with an "unrecorded Note on the property located at Quentin and Wood Street" (the "Property") in the amount of $150,000.00; and (c) interest in the amount of 20% per annum. (*Id.*)

47.     The Hollerichs received none of the consideration QWC agreed to provide by way of the QWC Agreements, including interest payments due to be paid on March 21, 2013 and March 21, 2014. Acri recommended the investment in QWC to the Hollerichs, prepared the QWC Agreements, and executed those agreements on behalf of QWC (and the person to whom notices were to be sent on behalf of QWC thereunder). (Ex. A at 3-4; Ex. B at 3-4.)

**D.     FINRA Permanently Bars Acri**

48.     FINRA is a private, non-governmental organization that is registered with the SEC as a self-regulatory organization pursuant to the Securities Exchange Act of 1934. At all times relevant to the allegations herein, Acri was FINRA-registered and employed by FINRA-registered firms.

49.     On information and belief, FINRA's Department of Enforcement commenced an investigation concerning Acri's involvement in the sale of alternative investments and defaulted promissory notes in 2013. In or about December 2013, FINRA served a Rule 8210 request for information upon Acri related to its investigation. FINRA ultimately determined that Acri provided only a partial and incomplete response to its request, which did not substantially comply with all aspects of the requests relating to FINRA's investigation.

50.     On March 18, 2014, FINRA entered an Order Accepting Offer of Settlement permanently barring Acri from associating with any FINRA member in any capacity after he

failed to fully respond to a request for documents and information in violation of FINRA Rules 8210 and 2010.

### E.     The SEC Bars Acri From the Securities Industry

51.     An SEC examination of Kenilworth detected potential misconduct that was referred to the agency's Enforcement Division. The SEC's subsequent investigation found that Acri misled clients in the offer and sale of promissory notes issued for the redevelopment of a retail shopping center near Hammond, Indiana, *i.e.*, the Woodmar Project.

52.     On June 11, 2014, the SEC issued a press release entitled, "Chicago-Area Attorney Charged After SEC Exam Spots Fraud in Real Estate Investment Offering." The press release explained how the SEC charged Acri, "the founder of an investment advisory firm located in suburban Chicago with defrauding investors in connection with a real estate venture for which his firm offered securities."

53.     On or about that same date, the SEC issued a cease-and-desist order, made certain findings, and imposed remedial sanction. (A true and correct copy of the SEC's Order Instituting Public Administrative and Cease-and-Desist Proceedings, Pursuant to Section 8A of the Securities Act of 1933, Sections 4C, 15(b), and 21C of the Securities Exchange Act of 1934, Sections 203(f) and 203(k) of the Investment Advisers Act of 1940, Section 9(b) of the Investment Company Act of 1940, and Rule 102(e)(1)(iii) of the Commission's Rules of Practice Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order (the "SEC Order") and accompanying press release is attached hereto as Exhibit C.)

54.     The SEC Order stated that in his offer and sale of the Prairie promissory notes, Acri knowingly failed to tell Kenilworth clients the following material facts:

a. Kenilworth clients and others, through the KAM Private Fund, previously loaned $500,000 to Praedium for the development of the Woodmar Project in 2005 and the KAM Private Fund had not been paid anything by Praedium on this loan;

b. The primary purpose for the offering and sale of Prairie notes to Kenilworth clients, including the Hollerichs, was to give other Kenilworth clients (*i.e.*, those who had invested in the KAM Private Fund) a chance to recover on their earlier investment in Praedium;

c. Praedium and Woodmar Hammond had become delinquent on the payment of its mortgage, property taxes, and certain contractor invoices;

d. Praedium was the developer of the Prairie project;

e. Praedium's principal was Acri's personal friend, who was also having financial difficulties;

f. Kenilworth would receive a five percent (5%) commission on the sale of the Prairie notes; and

g. Acri told investors, including the Hollerichs, that their investment in the Prairie notes would be secured by a security interest recorded by Praedium or Prairie, but took no action to ensure that such a recording occurred. (*Id.* ¶¶ 16, 20.)

55. The SEC Order further found that "Acri misappropriated $41,250 of the Kenilworth clients' funds that were supposed to be used to develop Prairie. Specifically, Acri spent: $28,750 in repayment of other former and current clients and fund investors; $7,500 in partial payment of a settlement of a lawsuit against Acri; and $5,000 to pay a person to purportedly seek a loan for Praedium/Woodmar." (*Id.* ¶ 18.)

56.     The SEC Order also found that "Kenilworth received $13,750 in commissions that Acri did not disclose to the Prairie investors. Acri controlled the use of those funds." (*Id.* ¶ 19.)

### F.     The Illinois Secretary of State Imposes Sanctions

57.     On or about July 1, 2014, the State of Illinois Secretary of State Securities Department (the "Secretary of State") entered a Temporary Order of Suspension and Prohibition (the "Temporary Order"). (A true and correct copy of the Temporary Order is attached hereto as Exhibit D.)

58.     In its Temporary Order, the Secretary of State found that Acri "failed to act as a fiduciary, failed to have reasonable and documented bases for representations which falsely lulled investors, and failed to adequately maintain books and records." (Ex. D at 1.) After noting that the SEC and FINRA had already barred Acri, the Temporary Order found that Acri's conduct constituted violations and cause to impose sanctions under Illinois Securities Law, 815 ILCS 5/1, *et seq.* (*Id.*)

59.     In addition to his role in Kenilworth – a managing member and principal from June 2002 until July 2012 and as an investment advisor until November 2012, the Secretary of State found that Acri was also President of QWC. The Secretary of State also found several related companies, including, as relevant here:

a.     Synergy Fund, LLC: an Illinois limited liability company and unregistered private pooled investment vehicle that was administratively dissolved by the State of Illinois in April 2010, for which Acri served as the managing member;

b.  KAM Private Fund, LLC: an Illinois limited liability company and unregistered private pooled investment vehicle that was administratively dissolved by the State of Illinois in May 2007, for which Acri served as the managing member;

c.  Awesome Kids, LLC: an Illinois limited liability company and educational toy and video company that was administratively dissolved by the State of Illinois in August 2008 and which was under common management with, among others, Pacific Phoenix Group;

d.  Pacific Phoenix Group, LLC: an Illinois corporation and real estate development/holding company that was administratively dissolved by the State of Illinois in April 2013 and which was under common management with, among others, Awesome Kids;

e.  Gannett Capital, Inc.: an Illinois limited liability company and real estate development/holding company, which was under common management with Woodmar Hammond, Prairie, and Praedium;

f.  Praedium Development Corp.: an Illinois corporation and real estate development/holding company, which was under common management with Woodmar Hammond, Gannett Capital, and Prairie;

g.  Prairie Common Holdings, LLC: an Illinois limited liability company and real estate development/holding company, which was under common management with Woodmar Hammond, Gannett Capital, and Praedium; and

h.  Woodmar Hammond, LLC: an Illinois limited liability company and real estate development/holding company that was administratively dissolved by the State of Illinois in July 2013 and which was under common management with, among others, Gannett Capital, Prairie, and Praedium).

60. The Temporary Order noted that KAM tax documents for 2011 indicated investments in, among others, Praedium in the amount of $560,000 and QWC of $35,000. (*Id.* at 7.) The Secretary of State also found that a March 15, 2012 document regarding KAM investments suggested investments in Woodmar Hammond of $500,000 and QWC of $25,000. (*Id.* at 9.)

61. The Secretary of State noted that a June 30, 2011 document relating to Synergy indicated investments by that fund in QWC in the amount of $25,000. (*Id.* at 8.) A similar amount of investment in QWC was noted as of a March 15, 2012 document. (*Id.*)

62. The Secretary of State also noted that a dispute arose between Acri and a Kenilworth principal regarding reporting responsibilities and possession of information regarding Synergy and KAM, including with respect to investments held in Praedium and QWC. (*Id.* at 7-8.) After various investors made inquiries with respect to the Synergy and KAM funds, the principals of Kenilworth informed investors in November 2012 that Acri was no longer associated with Kenilworth and that Kenilworth "had no affiliation with the Funds and that [Acri] created and managed the Funds outside of his role at Kenilworth." (*Id.* at 9.)

63. On or about August 4, 2014, the Secretary of State issued its Final Order of Suspension and Prohibition, in substantially the same form as the Temporary Order, permanently suspending Acri as an investment adviser representative and prohibiting him from offering or selling securities in the State of Illinois.

**E.    Hollerichs Make Demand on Their Investments**

64. Throughout 2012 and 2013, Mr. Hollerich reguraly followed up with Acri regarding the Hollerichs' investments. Mr. Hollerich repeatedly made requests of Acri and

16

Kenilworth for statements or other financial records relating to their investments in QWC and the Hammond Project. None were ever provided.

65.     Acri told Mr. Hollerich that he had provided DeSouza with appoximately $120,000 of the Hollerichs' QWC investment as a "down-payment" for her services in moving the QWC project forward. Acri sometimes referred to DeSouza as the developer and other times referred to her as a consultant.

66.     Acri later explained that since the zoning for the assisted living facility was not approved, he was working with DeSouza to get money refunded to the Hollerichs. On information and belief, no permit application was submitted or persued before the Village of Palatine by QWC or by anyone else on QWC's behalf.

67.     Despite requests from Mr. Hollerich, Acri never provided any proof that he was actually in discussions with DeSouza and never provided any documentation with respect to QWC, despite repeated promises to do so.

68.     Acri, at one point, recommended that Mr. Hollerich take over control of QWC, incluidng investing more money in the project, and that Acri would help Mr. Hollerich move it forward. Mr. Hollerich rejected this recommendation.

69.     In May 2013, the Hollerichs began the process of moving all of their monies from Acri and Kenilworth's control. At the time, Acri and Kenilworth still held approximately $500,000 of the Hollerichs' assets under management. Throughout 2012 and 2013 after his departure from Kenilworth, Acri continued to give the Hollerichs generic and misleading updates about the Woodmar Project and QWC, alternating between his personal e-mail and his work assigned e-mail.

70.     After the Hollerichs removed all their monies from Acri and Kenilworth's management, they continued to pressure Acri for updates and documentation. Acri gave Mr. Hollerich the run-around and never provided the Hollerichs with any documentation with respect to their investments in the Woodmar Project or QWC.

71.     In or about 2013 and early 2014, Acri began telling Mr. Hollerich that Acri was probably going to have to sue DeSouza in order to get the money returned because she no longer had the funds. Acri later suggested that Mr. Hollerich sue DeSouza himself, noting that she was involved in other companies, including Awesome Kids and Pacific Phoenix Group. Acri failed to note, however, these companies were under common management with companies in which Acri was involved. Nor did Acri provide any evidence of any lawsuit or other demand served upon DeSouza for the monies purportedly given to her out of the Hollerichs' investment as a "down-payment" or an advance for the QWC project.

72.     After repeated fruitless attempts to obtain information from Acri about QWC and the Woodmar Project, on June 26, 2014, the Hollerichs sent a letter to Acri pursuant to the terms of the QWC Agreements (the "June 26 Letter"). (A true and correct copy of the June 26, 2014 demand letter is attached hereto as Exhibit E.) The June 26 Letter noted the various breaches committed by QWC, requested various items of information, and noted that the letter served as notice of default pursuant to Paragraph 1(a) of the QWC Agreements. (*Id.*)

73.     On or about July 3, 2014, Acri responded to the June 26 Letter. Acri did not deny that QWC had breached the QWC Agreements, invented various statements made by Acri (though he used to the term "we" without identifying any other participant to such purported conversations) to the Hollerichs, and stated that he and his partner had "offered to assign our

rights under the contract to Mr. Hollerich toward repayment of his loan, we feel we are entitled to $75,000 to $80,000."

74.     In other words, QWC, with Acri as its president, having already taken $150,000 from the Hollerichs and breached the resulting promissory note, Acri and his "partner" sought *additional monies* from the Hollerichs. Indeed, Acri set up a meeting between Mr. Hollerich and David Wallach, an attorney, to discuss the QWC project. During the course of this meeting, Mr. Wallach told Mr. Hollerich that he was not interested in moving the QWC project forward, despite Acri's representation that Mr. Wallach was involved in the QWC project for precisely that purpose and that Mr. Wallach would also lend financial resources to advance the project.

75.     On or about July 22, 2014, the Hollerichs sent a further letter noting the two different promissory notes and declaring the outstanding loan amounts plus 20% annual interest immediately due and owing. No response was received.

76.     On or about October 6, 2014, the Hollerichs sent a final follow-up letter, again noting the defaults and breaches by QWC and declaring the entirety of the $150,000 loaned plus 20% annual interest immediately due and owing. That same day Acri responded by stating that he had contacted Michael Hollerich and requested that Horizon Bank provide the Hollerichs with certain information.

77.     In sum, between 2011 and 2012, the Hollerichs "invested" $175,000 through Acri and Kenilworth by way of promissory notes bearing interest rates of 15-20%. The Hollerichs have received no payment on these contracts or other promised consideration; yet, Acri has requested that the Hollerichs pay him an additional $75-85,000.

**Count I**
**Violation of Investment Advisers Act of 1940 (against defendants Acri and Kenilworth)**

78. Plaintiffs reallege and incorporate herein by reference the allegations contained in Paragraphs 1-77 of this Complaint.

79. Sections 206(1) and 206(2) of the Investment Advisers Act prohibit fraudulent conduct by an investment adviser.

80. Acri and Kenilworth, as the Hollerichs' registered investment advisers, owed the Hollerichs fiduciary duties under the Investment Advisers Act of 1940 § 201, *et seq.*, including the duty of utmost good faith to avoid misleading clients and the duty to disclose all material facts and all possible conflicts of interest.

81. As alleged more fully herein, Acri and Kenilworth violated their fiduciary duties to the Hollerichs by, inter alia, failing to disclose:

a. Kenilworth clients and others, through the KAM Private Fund, previously loaned $500,000 to Praedium for the development of the Woodmar Project in 2005 and the KAM Private Fund had not been paid anything by Praedium on this loan;

b. The primary purpose for the offering and sale of Prairie notes to Kenilworth clients, including the Hollerichs, was to give other Kenilworth clients (*i.e.*, those who had invested in the KAM Private Fund) a chance to recover on their earlier investment in Praedium;

c. Praedium and Woodmar Hammond had become delinquent on the payment of a mortgage, property taxes, and certain contractor invoices;

d. Praedium was the developer of the Prairie project;

e. Praedium's principal was Acri's personal friend, who was also having financial difficulties;

20

f.      Kenilworth would receive a five percent (5%) commission on the sale of the Prairie notes;

g.      Acri told the Hollerichs that their investment in the Prairie notes would be secured by a security interest recorded by Woodmar Hammond, Praedium or Prairie, but took no action to ensure that such a recording occurred;

h.      Failing to disclose to the Hollerichs that a substantial amount of their QWC investment funds would be used to pay back taxes and as a payment to DeSouza;

i.      Failing to obtain or take any action necessary to obtain a security interest in real estate to secure the QWC Agreements and the Hollerichs' investment as represented; and

j.      Misrepresenting the status and potential success of the permitting process with the Village of Palatine for the purported QWC assisted living facility.

82.     Acri further breached the fiduciary duties he owed the Hollerichs by misappropriating over $40,000 of Kenilworth client's funds, including those invested by the Hollerichs, that were supposed to be used to develop the projects invested in by these clients.

83.     These breaches of fiduciary duties owed by Acri and Kenilworth to the Hollerichs by way of failing to disclose these material facts entitles the Hollerich to void any investment adviser contracts with Kenilworth and Acri, including receiving restitution of any fees paid to them by the Hollerichs by way of such agreements.

**Count II**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(against defendants Acri and Kenilworth)**

84.     Plaintiffs reallege and incorporate herein by reference the allegations contained in Paragraphs 1-77 of this Complaint.

85. Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder prohibit fraudulent conduct, including misrepresentations and omissions, in the offer or sale of securities and in the connection with the purchase or sale of securities.

86. Acri and Kenilworth made misrepresentations and omissions of material fact herein previously alleged with the intent that the Hollerichs rely on those material misrepresentations and omissions of material fact. Specifically, Acri and Kenilworth, among other things, made the following material representations and omissions:

a. Kenilworth clients and others, through the KAM Private Fund, previously loaned $500,000 to Praedium for the development of the Woodmar Project in 2005 and the KAM Private Fund had not been paid anything by Praedium on this loan;

b. The primary purpose for the offering and sale of Prairie notes to Kenilworth clients, including the Hollerichs, was to give other Kenilworth clients (*i.e.*, those who had invested in the KAM Private Fund) a chance to recover on their earlier investment in Praedium;

c. Praedium and Woodmar Hammond had become delinquent on the payment of a mortgage, property taxes, and certain contractor invoices;

d. Praedium was the developer of the Prairie project;

e. Praedium's principal was Acri's personal friend, who was also having financial difficulties;

f. Kenilworth would receive a five percent (5%) commission on the sale of the Prairie notes;

         g.      Acri told the Hollerichs that their investment in the Prairie notes would be secured by a security interest recorded by Woodmar Hammond, Praedium or Prairie, but took no action to ensure that such a recording occurred;

         h.      Failing to disclose to the Hollerichs that a substantial amount of their QWC investment funds would be used to pay back taxes and as a payment to DeSouza;

         i.      Failing to obtain or take any action necessary to obtain a security interest in real estate to secure the QWC Agreements and the Hollerichs' investment as represented; and

         j.      Misrepresenting the status and potential success of the permitting process with the Village of Palatine for the purported QWC assisted living facility.

87.     The above omissions were made with scienter as Acri and Kenilworth intended to defraud their clients by failing to disclose, in order to induce their investment, that Kenilworth would receive a commission as a result of investments made by the Hollerichs, including a five percent (5%) commission for Kenilworth on the sale of the Prairie notes, and that Acri intended to misappropriate a portion of the funds invested by the Hollerichs for his own benefit.

88.     The above omissions were directly connected the Hollerichs' purchase of securities recommended and arranged by Acri and Kenilworth.

89.     The Hollerichs relied upon the statements by Acri and Kenilworth, as their trusted registered investment advisors, and the omissions above as they would not have invested $175,000 with Acri and Kenilworth if they were aware of this clear conflict of interest, the true state of the projects in which they were invested, and that Acri intended to abscond and misappropriate part of these funds for his own benefit.

90.     The Hollerichs have suffered economic losses in the form of $175,000 transferred to Acri and Kenilworth.

91.     The losses were proximately caused by Acri and Kenilworth because the Hollerichs would not have invested said sums if the omitted information alleged above had been known to them, Acri misappropriated certain sums of these investments for his own benefit, Kenilworth received a commission on the Hollerichs' investment, and Acri and Kenilworth failed to take action to obtain the promised security for the Hollerichs' investment.

**Count III**
**Breach of QWC Agreements (against defendant QWC)**

92.     Plaintiffs reallege and incorporate herein by reference the allegations contained in Paragraphs 1-77 of this Complaint.

93.     The QWC Agreements, signed by Acri on behalf of QWC, are valid and enforceable contracts that bind QWC.

94.     Plaintiffs performed all of their obligations under the QWC Agreements, including investing a total of $150,000 from their respective IRAs that was paid to QWC and making demand pursuant to the terms of those agreements.

95.     QWC breached the QWC Agreements by, among other things, failing to: (a) transfer to the Hollerichs a 25% ownership interest in QWC; (b) provide the Hollerichs with an unrecorded Note on the Property in the amount of $150,000.00; and (c) pay interest in the amount of 20% per annum.

96.     The Hollerichs have been injured as a direct and proximate result of QWC's breach of the QWC Agreements.

**Count IV**
**Breach of Woodmar Agreement**
**(against defendants Woodmar Hammond, Prairie and/or Praedium)**

97.     Plaintiffs reallege and incorporate herein by reference the allegations contained in Paragraphs 1-77 of this Complaint.

98.     The Woodmar Agreement is a valid and enforceable contract that binds Woodmar Hammond, Prairie and/or Praedium.

99.     Plaintiffs performed all of their obligations under the Woodmar Agreement, including investing a total of $25,000 from Ms. Hollerich's IRA that was paid to Woodmar Hammond, Prairie and/or Praedium.

100.    Woodmar Hammond, Prairie and/or Praedium breached the Woodmar Agreement by, among other things, failing to pay interest in the amount of 15% per annum and failing to secure the Hollerichs' investment.

101.    The Hollerichs have been injured as a direct and proximate result of Woodmar Hammond, Prairie and/or Praedium's breach of the Woodmar Agreement.

**Count V**
**Breach of Fiduciary Duty (against defendants Acri and Kenilworth)**

102.    Plaintiffs reallege and incorporate herein by reference the allegations contained in Paragraphs 1-77 of this Complaint.

103.    By reason of the trust and confidence that the Hollerichs reposed in them, including as a result of their position as the Hollerichs' registered investment advisors, Acri and Kenilworth owed the Hollerichs fiduciary duties, includes the duties of loyalty, utmost honesty, candor, and due care.

104.    Acri and Kenilworth breached their fiduciary duties to Hollerichs by, among others, the following misrepresentations and omissions:

          a.      Kenilworth clients and others, through the KAM Private Fund, previously loaned $500,000 to Praedium for the development of the Woodmar Project in 2005 and the KAM Private Fund had not been paid anything by Praedium on this loan;

b.      The primary purpose for the offering and sale of Prairie notes to Kenilworth clients, including the Hollerichs, was to give other Kenilworth clients (*i.e.*, those who had invested in the KAM Private Fund) a chance to recover on their earlier investment in Praedium;

c.      Praedium and Woodmar Hammond had become delinquent on the payment of a mortgage, property taxes, and certain contractor invoices;

d.      Praedium was the developer of the Prairie project;

e.      Praedium's principal was Acri's personal friend, who was also having financial difficulties;

f.      Kenilworth would receive a five percent (5%) commission on the sale of the Prairie notes;

g.      Acri told the Hollerichs that their investment in the Prairie notes would be secured by a security interest recorded by Woodmar Hammond, Praedium or Prairie, but took no action to ensure that such a recording occurred;

h.      Failing to disclose to the Hollerichs that a substantial amount of their QWC investment funds would be used to pay back taxes and as a payment to DeSouza;

i.      Failing to obtain or take any action necessary to obtain a security interest in real estate to secure the QWC Agreements and the Hollerichs' investment as represented; and

j.      Misrepresenting the status and potential success of the permitting process with the Village of Palatine for the purported QWC assisted living.

105.    As a direct and proximate result of Acri and Kenilworth's breaches of their fiduciary duties, the Hollerichs have been injured and Acri and Kenilworth have been unjustly enriched, including by receipt of certain commissions and other compensation.

**Count VI**
**Common Law Fraud – Woodmar/Prairie (against defendants Acri and Kenilworth)**

106.    Plaintiffs reallege and incorporate herein by reference the allegations contained in Paragraphs 1-77 of this Complaint.

107.    Acri and Kenilworth made misrepresentations and omissions of material fact herein previously alleged with the intent that the Hollerichs rely on those material misrepresentations and omissions of material fact. Specifically, Acri and Kenilworth, among other things, made the following material representations and omissions:

a.    Kenilworth clients and others, through the KAM Private Fund, previously loaned $500,000 to Praedium for the development of the Woodmar Project in 2005 and the KAM Private Fund had not been paid anything by Praedium on this loan;

b.    The primary purpose for the offering and sale of Prairie notes to Kenilworth clients, including the Hollerichs, was to give other Kenilworth clients (*i.e.*, those who had invested in the KAM Private Fund) a chance to recover on their earlier investment in Praedium;

c.    Praedium and Woodmar Hammond had become delinquent on the payment of a mortgage, property taxes, and certain contractor invoices;

d.    Praedium was the developer of the Prairie project;

e.    Praedium's principal was Acri's personal friend, who was also having financial difficulties;

f.    Kenilworth would receive a five percent (5%) commission on the sale of the Prairie notes; and

       g.     Acri told the Hollerichs that their investment in the Prairie notes would be secured by a security interest recorded by Woodmar Hammond, Praedium or Prairie, but took no action to ensure that such a recording occurred.

108.    The misrepresentations and omissions of material fact directed by Acri and Kenilworth to the Hollerichs was part of an overall scheme to defraud the Hollerichs.

109.    As Acri and Kenilworth were the registered investment advisers and thus fiduciaries of the Hollerich, the Hollerichs reasonably relied, to their detriment, on the aforesaid material misrepresentations and omissions of material fact.

110.    As a direct and proximate result of their reasonable reliance on the aforesaid misrepresentations and omissions of material fact, the Hollerichs suffered damages in excess of $25,000.

**Count VII**
**Common Law Fraud – QWC (against defendants Acri and Kenilworth)**

111.    Plaintiffs reallege and incorporate herein by reference the allegations contained in Paragraphs 1-77 of this Complaint.

112.    Acri and Kenilworth made misrepresentations and omissions of material fact herein previously alleged with the intent that the Hollerichs rely on those material misrepresentations and omissions of material fact. Specifically, Acri and Kenilworth, among other things, made the following material representations and omissions: (a) that Acri and an undisclosed "partner" had invested approximately $400,000 in the QWC development; (b) that QWC suffered from financial difficulties and was facing problems with municipal regulatory approval of the proposed use of the parcel; and (c) Acri told the Hollerichs that their investment in QWC would be secured by a security interest in the property, but took no action to ensure that such a recording occurred.

113.    The misrepresentations and omissions of material fact above directed by Acri and Kenilworth to the Hollerichs was part of an overall scheme to defraud the Hollerichs.

114.    As Acri and Kenilworth were the registered investment advisers and thus fiduciaries of the Hollerich, the Hollerichs reasonably relied, to their detriment, on the aforesaid material misrepresentations and omissions of material fact.

115.    As a direct and proximate result of their reasonable reliance on the aforesaid misrepresentations and omissions of material fact, the Hollerichs suffered damages in excess of $150,000.

## Count VIII
## Civil Conspiracy (against all defendants)

116.    Plaintiffs reallege and incorporate herein by reference the allegations contained in Paragraphs 1-77 of this Complaint.

117.    Defendant Acri agreed to and did work in combination with certain other defendants to further a common plan or scheme to defraud the Hollerichs.

118.    In furtherance of the conspiracy, among other things, Acri and Kenilworth breached their fiduciary duties and concealed or omitted material information, QWC and Woodmar Hammond, Praedium and/or Prairie breached various contractual duties and obligations, and DeSouza and Acri absconded with certain monies invested by the Hollerichs, all as more fully alleged herein.

119.    As a proximate and direct result of defendants' conspiracy and the overt acts taken in furtherance thereof, the Hollerichs have been damaged in an amount to be proven at trial.

120.    Defendants are jointly and severally liable as co-conspirators for all damages flowing from the conspiracy.

## Count IX
### Unjust Enrichment (against all defendants)

121.     Plaintiffs reallege and incorporate herein by reference the allegations contained in Paragraphs 1-77 of this Complaint.

122.     Plaintiffs conferred a benefit upon the above defendants by way of their investment of $175,000 in the Woodmar Project and QWC, including approximately $110,000 paid over to DeSouza related to QWC and certain portions of the Hollerichs' investment in the Woodmar Project paid to the KAM Private Fund, used by Acri for his personal benefit, and undisclosed commissions paid to Kenilworth.

123.     Defendants appreciated the fact of such benefit by way of their receipt of certain of the sums of the $175,000 paid or invested by the Hollerichs.

124.     Under the circumstances alleged herein, acceptance and retention by the defendants of the benefit is such that it would be inequitable without payment of the value thereof.

## Count X
### Accounting (against defendants Acri and Kenilworth)

125.     Plaintiffs reallege and incorporate herein by reference the allegations contained in Paragraphs 1-77 of this Complaint.

126.     With respect to their claim for an accounting, Plaintiffs lack an adequate remedy at law.

127.     At all times relevant herein, defendants Acri and Kenilworth occupied a fiduciary relationship and owed fiduciary duties to the Hollerichs. Despite repeated demands for an accounting of all funds invested by the Hollerichs in the Woodmar Project and QWC, defendants have failed to provide such any such financial information

128.    As alleged more fully herein, defendants Acri and Kenilworth have breached their fiduciary duties and committed fraud upon the Plaintiffs. Moreover, given the lack of documentation provided to the Hollerichs and various explanations provided by Acri, there is a need for discovery into the multiple, complex accounts necessitating an accounting.

**Count XI**
**Violation of Illinois Securities Act of 1953, 815 ILCS 5/1, *et seq.***
**(against defendants Acri and Kenilworth)**

129.    Plaintiffs reallege and incorporate herein by reference the allegations contained in Paragraphs 1-77 of this Complaint.

130.    Defendants Acri and Kenilworth sold to the Hollerichs securities within the meaning of the Illinois Securities Act of 1953, 815 ILC 5/1, *et seq.* (the "Illinois Securities Act").

131.    By way of the misrepresentations and omissions more fully alleged above, Acri and Kenilworth committed violations of the Illinois Securities Act by, including, among others:

    a.    Engaging in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser;

    b.    Obtaining money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;

    c.    Employing any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly; and

    d.    When acting as an investment adviser, investment adviser representative, or federal covered investment adviser, by any means or instrumentality, directly or indirectly: (1) to employ any device, scheme or artifice to defraud any client or prospective client; (2) to engage

31

in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; or (3) to engage in any act, practice, or course of business which is fraudulent, deceptive or manipulative.

132.    As a proximate and direct result of defendants' violation of the Illinois Securities Act, the Hollerichs have been damaged in an amount to be proven at trial.

**Count XII**
**Violation of Illinois Consumer Fraud Act (against defendants Acri and Kenilworth)**

133.    Plaintiffs reallege and incorporate herein by reference the allegations contained in Paragraphs 1-77 of this Complaint.

134.    Defendants Acri and Kenilworth committed the following deceptive acts or practices relating to the Hollerichs' investment in the Hammond Project and QWC:

a.    Kenilworth clients and others, through the KAM Private Fund, previously loaned $500,000 to Praedium for the development of the Woodmar Project in 2005 and the KAM Private Fund had not been paid anything by Praedium on this loan;

b.    The primary purpose for the offering and sale of Prairie notes to Kenilworth clients, including the Hollerichs, was to give other Kenilworth clients (*i.e.*, those who had invested in the KAM Private Fund) a chance to recover on their earlier investment in Praedium;

c.    Praedium and Woodmar Hammond had become delinquent on the payment of a mortgage, property taxes, and certain contractor invoices;

d.    Praedium was the developer of the Prairie project;

e.    Praedium's principal was Acri's personal friend, who was also having financial difficulties;

32

      f.     Kenilworth would receive a five percent (5%) commission on the sale of the Prairie notes;

      g.     Acri told the Hollerichs that their investment in the Prairie notes would be secured by a security interest recorded by Praedium or Prairie, but took no action to ensure that such a recording occurred;

      h.     Failing to disclose to the Hollerichs that a substantial amount of their QWC investment funds would be used to pay back taxes and as a payment to DeSouza;

      i.     Failing to obtain or take any action necessary to obtain a security interest in real estate to secure the QWC Agreements and the Hollerichs' investment as represented; and

      j.     Misrepresenting the status and potential success of the permitting process with the Village of Palatine for the purported QWC assisted living facility.

135.    The defendants intended that the Plaintiffs rely on these deceptions in order to convince Plaintiffs to invest $175,000 collectively in the Hammond Project and QWC.

136.    The above deceptions occurred during the course of conduct involving commerce and trade as part of Acri and Kenilworth's solicitation and sale of promissory notes to the Hollerichs relating to the Hammond Project and QWC in their role as registered investment advisers to the Hollerichs.

137.    The Hollerichs have suffered damages as a direct and proximate result of these deceptions by defendants Acri and Kenilworth in the amount of at least $175,000.

## CONCLUSION

WHEREFORE, plaintiffs Michael and Laura Hollerich respectfully request that this Court:

A.      Enter judgment in their favor and against the defendants on each Count of the Complaint;

B.      Rescission of the Hollerichs' investment adviser agreement with Acri and Kenilworth and restitution in the form of any fees paid by the Hollerichs thereunder to Acri or Kenilworth;

C.      Award the Hollerichs actual damages in an amount to be proven at trial in the amount of at least $175,000;

D.      Order defendants to account for, and disgorge to, the Hollerichs all amounts by which they have been unjustly enriched as a result of their illicit activities;

E.      Award the Hollerichs their attorneys' fees and costs;

F.      Award the Hollerichs punitive damages in an amount to be proven at trial;

G.      Award the Hollerichs prejudgment interest at the contractual rate, or alternatively the statutory rate, as well as post-judgment interest; and

H.      Such other and further relief as this Court deems just and proper.


Dated: December 29, 2014                    Respectfully submitted,
       Chicago, Illinois
                                            /s/ Justin L. Heather_____
                                            William J. Quinlan (wjq@quinlanfirm.com)
                                            Justin L. Heather (jheather@quinlanfirm.com)
                                            Sarah M. Steele (ssteele@quinlanfirm.com)
                                            The Quinlan Law Firm LLC
                                            20 South Clark Street, Suite 2900
                                            Chicago, Illinois 60603
                                            Tel: 312-629-6022
                                            Fax: 312-730-7939

                                            *Attorneys for plaintiffs Michael & Laura Hollerich*