

EXHIBIT D

IN THE MATTER OF:                                     )
                                                      )
      ROBERT C. ACRI, CRD #1429736     )     File No. 1300158
                                                      )
                                                      )

## TEMPORARY ORDER OF SUSPENSION AND PROHIBITION

TO THE RESPONDENT:

> Robert C. Acri
> 566 Orchard Lane
> Winnetka, IL 60093

On information and belief, I, Jesse White, Secretary of State for the State of Illinois, through my designated representative, the Securities Director, who has been fully advised in the premises by the staff of the Securities Department, Office of the Secretary of State, (the "Department"), herein find:

### Summary

1. Robert C. Acri (the "Respondent") is a registered investment adviser representative who created and managed three unregistered private pooled investment vehicles. Since then, he has failed to act as a fiduciary, failed to have reasonable and documented bases for representations which falsely lulled investors, and failed to adequately maintain books and records. As a result of the repeated failures, Respondent has demonstrated an inability to properly conduct business.

2. Furthermore, the Securities and Exchange Commission (the "SEC") and the Financial Industry Regulatory Authority ("FINRA") have barred Respondent.

3. Respondent's conduct constitutes cause to impose sanctions pursuant to Sections 8.E(1)(b), (j), (k), (m) and (q) of the Illinois Securities Law [815 ILCS 5/1 *et seq.*] (the "Act") and violates Sections 12.A, G, H, and J of the Act.

## Background

4. At all times relevant hereto, Robert C. Acri was registered as an investment adviser representative in the State of Illinois pursuant to Section 8 of the Act.

5. Respondent is also an attorney, authorized to practice law in the State of Illinois since May 5, 1983.

6. Respondent is Chief Compliance Officer at Synergistic Group, LLC, an Illinois limited liability company and investment adviser registered with the State of Illinois since November 9, 2011.

7. Previously, Respondent served in the following capacities, among others:

    a. Managing member and principal, from June 2002 to July 2012, and investment adviser representative, until November 2012, of Kenilworth Asset Management, LLC, an Illinois limited liability company and an investment adviser registered with the SEC since February 25, 2011;

    b. Registered representative, from August 2000 to June 2006, of Oakbrook Financial Group, Inc., an Illinois corporation and a dealer registered with the State of Illinois from April 1998 to June 2014;

    c. Sole shareholder of IRCA Corp., an Illinois corporation and real estate development/holding company, administratively dissolved by the State of Illinois on June 8, 2012 (IRCA is an investor in Synergy Fund and Synergy Private Capital Fund);

    d. Managing member of Synergy Fund LLC, an Illinois limited liability company and unregistered private pooled investment vehicle, which was administratively dissolved by the State of Illinois on April 9, 2010 (Synergy Fund is an investor in Synergy Private Capital Fund);

    e. Managing member of KAM Private Fund, LLC, an Illinois limited liability company and unregistered private pooled investment vehicle, which was administratively dissolved by the State of Illinois on May 11, 2007;

    f. Managing member of Synergy Private Capital Fund, LLC, an Illinois limited liability company and unregistered private pooled investment vehicle, which was administratively dissolved by the State of Illinois on November 28, 2004;

    g. Managing member (for an unknown duration) of Goldstar Private Capital Fund One, LLC, a Delaware limited liability company and unregistered private pooled

investment vehicle (Goldstar Private Capital Fund One is an investor in Synergy Private Capital Fund); and

h. President of Quentin Woods Corp., an Illinois corporation and real estate development/holding company.

8. Related companies are:

a. Awesome Kids, LLC - an Illinois limited liability company and educational toy and video company, administratively dissolved by the State of Illinois on August 27, 2008 (under common management with Tucker's Cove, Jupiter Coastal Investments, Fountech International, Pacific Phoenix Group, and Tri-Mar; operating from a property which came to be owned by IRCA);

b. Fountech International, LTD. - an Illinois corporation and real estate development/holding company, administratively dissolved by the State of Illinois on July 1, 2006 (under common management with Awesome Kids, Tucker's Cove, Jupiter Coastal Investments, Pacific Phoenix Group, and Tri-Mar);

c. Jupiter Coastal Investments, LLC - a Florida limited liability company and real estate development/holding company, administratively dissolved by the State of Florida on September 25, 2009 (under common management with Awesome Kids, Tucker's Cove, Fountech International, Pacific Phoenix Group, and Tri-Mar; with a mailing address which came to be owned by IRCA);

d. Tri-Mar, LLC - a Florida limited liability company and real estate development/holding company, administratively dissolved by the State of Florida on September 14, 2007 (under common management with Awesome Kids, Tucker's Cove, Fountech International, Pacific Phoenix Group, and Jupiter Coastal Investments; with a mailing address which came to be owned by IRCA);

e. Tucker's Cove, LLC - a Florida limited liability company and real estate development/holding company, administratively dissolved by the State of Florida on September 27, 2013 (under common management with Awesome Kids, Jupiter Coastal Investments, Fountech International, Pacific Phoenix Group, and Tri-Mar; with an initial mailing address which came to be owned by IRCA);

f. Pacific Phoenix Group, LLC - an Illinois corporation and real estate development/holding company, administratively dissolved by the State of Illinois on April 1, 2013 (under common management with Awesome Kids, Tucker's Cove, Jupiter Coastal Investments, Fountech International, and Tri-Mar);

g. *Gannett Capital, Inc.* - an Illinois limited liability company and real estate development/holding company (under common management with Woodmar Hammond, Prairie Common Holdings, and Praedium Development);

h. Praedium Development Corp. - an Illinois corporation and real estate development/holding company (under common management with Woodmar Hammond, Gannett Capital, and Prairie Common Holdings);

i. Prairie Common Holdings, LLC - an Illinois limited liability company and real estate development/holding company (under common management with Woodmar Hammond, Gannett Capital, and Praedium Development);

j. Woodmar Hammond, LLC - an Illinois limited liability company and real estate development/holding company, administratively dissolved by the State of Illinois on July 12, 2013 (under common management with Praedium Development, *Gannett Capital, and Prairie Common Holdings*);

k. "CFA, LLC" - an Indiana limited liability company and investment advisory firm (Synergy Private Capital Fund owns 5-10% of the company);

l. "MM, LLC" - a Delaware limited liability company and computer systems design services company; and

m. "MOD, Inc." - an Illinois corporation and software company.

#### The Funds

9. According to Respondent, investors in Synergy Fund, KAM Private Fund, and Synergy Private Capital Fund (collectively, the "Funds") consisted of Kenilworth Asset Management clients, Respondent, his family members, his friends, and his neighbors. The last investor was in or around 2009.

10. Also according to Respondent, the Funds invested in real estate, private equity, and oil and gas, primarily by means of debt instruments.

11. The private placement memorandum for Synergy Fund, dated November 23, 2001, provided that it would invest in large cap stocks (40%), mid cap stocks (30%), and private debt and equity securities (30%). A fundamental growth and technical value investment style was to be used to achieve significant returns for investors.

   a. Five experienced professionals were to serve as an Advisory Committee and supervise key management decisions.

b. The expected return was 6%, prior to any profit distributions to Respondent and other Fund managers.

c. The annual management fee was to be 0.75% and the annual custody and reporting fee was 0.25%.

d. No new investments were to be made after the fifth anniversary without the consent of the investors.

e. At the time, there was no known pending or threatened litigation, contingencies, or judgments.

12. The private placement memorandum for Synergy Private Capital Fund, dated June 2, 2003, provided that investors would have current income and long-term capital appreciation through mezzanine investments and equity investments. The private placement memorandum also stated, "The Manager has experienced success in the current difficult market conditions with the management of the Synergy Fund."

a. Mezzanine investments were to be in privately-held, small- and mid-market companies with strong cash flow characteristics.

b. Equity investments were to be in privately-held, small- and mid-sized companies that were poised to experience substantial growth in the short- and mid-term future and were intrinsically sound with proven business models.

c. Risk tolerance and approval of investments would be under the oversight of an Advisory Board, as appointed by Respondent.

d. Advisory Board members and the Fund manager were to be paid an annual fee of $2,500.

e. Advisory Board approval was to be required before: making any private equity investment; consummating any mezzanine investment in an amount in excess of $500,000; and incurring debt in excess of 2% of capital commitments.

13. The private placement memorandum for KAM Private Fund, dated November 23, 2004, provided that investors would have current income and long-term capital appreciation through mezzanine investments and equity investments.

a. Mezzanine investments were to be in privately-held and public companies of all sizes, that were well-managed.

b. Equity investments were to be in privately-held and public, small- and mid-sized companies that were poised to experience substantial growth in the short- and mid-term future and were intrinsically sound with proven business models.

c. Annual management fees were 2%. Kenilworth Asset Management would be the Adviser to the fund and receive an annual fee of 1%.

d. Respondent and other Fund managers were to focus on available security and risk levels in setting pricing when evaluating investment opportunities.

14. Furthermore, Synergy Private Capital Fund and KAM Private Fund contained the following representations in their private placement memorandums:

a. Expected annual distributions to investors were to be 10% of the book value of the investor's capital account.

b. Respondent and other Fund managers were to conduct compliance and regulatory due diligence and consult with counsel on such issues prior to the consummation of investments.

c. Private equity investments were to have been structured to afford preferred rights to receive returns on its investments, preemptive rights to participate in any additional issuance of securities, anti-dilution protection, the right to force a public offering and other protections afforded to venture capital investors.

d. Notes were to be secured by second liens on the assets of the portfolio company and subordinate to bank loans but senior to all portfolio company equity.

e. Respondent and other Fund managers were to monitor the performance of the portfolio companies monthly financial reports, verify covenant compliance, exercise board rights, visit portfolio companies, and maintain continuous involvement with such companies.

f. All investments were to be subject to intensive analysis, including: review of historical performance; comparison of historical results to projections; evaluation of the company's ability to generate cash; downside scenarios and collateral coverage; and evaluation of the company's financial accounting systems.

## Records and Filings

15. Only one filing was made in the State of Illinois for any of the Funds. Synergy Fund was notice filed in Illinois, alleging that a Form D had been filed with the SEC and

the existence of a valid registration exemption pursuant to Rule 506 of Regulation D. The filing was effective from December 26, 2001 to December 25, 2002.

16. Synergy Fund tax documents for 2011 (the "2011 Synergy Fund Taxes") indicated that it had assets of $5 in cash and $3.5 million invested in: Synergy Private Capital Fund ($1.2 million), Awesome Kids ($1.3 million), MOD ($735,000), Fountech International ($100,000), Pacific Phoenix Group ($700,000), and MM ($96,500). *See* Appendix, Table 1. The tax documents also note a $15,000 cash distribution from the Awesome Kids investment to one individual Synergy Fund investor.

17. KAM Private Fund tax documents for 2011 (the "2011 KAM Private Fund Taxes") indicated that it had assets of $118 in cash and $1.2 million invested in: Praedium Development ($560,000), Awesome Kids ($485,000), Quentin Woods ($35,000), Synergy Private Capital Fund ($47,000), and Gannett Capital ($25,000). *See* Appendix, Table 1. The tax documents also note cash distributions of $1,250, $1,000, and $1,000 from an unknown source to three KAM Private Fund investors (two individuals and one trust).

18. Synergy Private Capital Fund tax documents for 2011 (the "2011 Synergy Private Capital Fund Taxes") indicated that cash in the amount of $4.5 million was the beginning and ending asset. No investments were disclosed. *See* Appendix, Table 1.

19. The custodian for the Funds required quarterly letters and annual Alternative Investment Fair Market Value Reporting Forms from Respondent to confirm clients' positions in the Funds. Until Respondent left Kenilworth Asset Management, either Respondent or another principal of Kenilworth Asset Management would provide the requested information. After that period, a dispute arose to who would provide the service.

   a. In February 2013, a dispute arose as to who should provide information to the custodian about Synergy Fund and KAM Private Fund. The Kenilworth Asset Management principal, who had been providing information in the past, denied any association with Synergy Fund and KAM Private Fund. Respondent then denied having access to the records and denied being the managing partner of Synergy Fund and KAM Private Fund.

   b. Later in February 2013, Respondent did provide some information to the custodian indicating that investor positions had not changed.

   c. The dispute continued into April 2013, when the custodian requested information about Synergy Private Capital Fund. Again, the Kenilworth Asset Management principal, who had been providing information in the past, denied any association with Synergy Private Capital Fund. Respondent then denied having access to the

records, denied being the "managing partner" of the Synergy Private Capital Fund, and stated that the investors were clients of Kenilworth Asset Management.

20. Around or about early 2013, investors inquired into the status of the Schedule K-1 tax forms for their investments in the Funds. Investors were told by Respondent that Kenilworth Asset Management would provide the tax forms and denied having access to the records. Kenilworth Asset Management continued to deny any association or responsibility for the Funds.

## Client Communications

21. A document dated June 30, 2011 (the "2011 Synergy Fund Document") stated, "In 2010 and 2011 YTD, the Synergy Fund received no interest payments from its investments, however, the investments continued to fight the recession with positive developments." The document indicated that about $1.5 million was invested in the Synergy Private Capital Fund. Also, Synergy Fund was directly invested in: Awesome Kids/Tucker's Cove ($1.5 million), Quentin Woods ($25,000), CFA ($250,000), and MOD ($700,000). *See* Appendix, Table 2. The document also stated (emphasis in original):

> Since summer of 2008, we have suspended our fees on the fund and our [sic] currently working many hours per week in order to create a liquidity event to begin a cash flow back to the investors. In addition, we are paying for the accounting costs of K-1 preparation and tax returns from Kenilworth Asset Management and NOT from the fund. We are motivated to generate a cash flow from the investments as soon as possible in order to make distributions to you, the investor. We are disappointed in the performance of the fund to date, but we are seeing some positive movement in the business plans of the individual investments.

22. A document dated March 15, 2012 (the "2012 KAM Private Fund Document"), stated "In 2011, and YTD 2012, the KAM Private Fund received no interest payments from its investments, however, the investments continued to fight the recession with positive developments." The document indicated that there were investments in: Woodmar Hammond ($500,000), Awesome Kids/Tucker's Cove ($400,000), and Quentin Woods ($25,000). *See* Appendix, Table 2. The document also stated (emphasis in original):

> Since summer of 2009, we have suspended our fees on the fund and our [sic] currently working many hours per week in order to create a liquidity event to begin a cash flow back to the investors. In addition, we are paying for the accounting costs of K-1 preparation and tax returns from Kenilworth Asset

Management and NOT from the fund. We are motivated to generate a cash flow from the investments as soon as possible in order to make distributions to you, the investor. We are disappointed in the performance of the fund to date, but we are seeing some positive movement in the business plans of the individual investments.

23. Another document dated March 15, 2012 (the 2012 Synergy Private Capital Fund Document"), stated, "In 2011, the Synergy Private Capital Fund received no interest payments from its investments... Fortunately, the Borrowers have not sought bankruptcy protection and we have in many cases found them sources of additional capital to move forward on development projects." The document indicated that there were investments in: Awesome Kids/Tucker's Cove ($2,500,000), Quentin Woods ($25,000), CFA ($250,000), and MOD ($225,000). (The companies are the same as those in which Synergy Fund invested, according to the 2011 Synergy Fund Document.) *See* Appendix, Table 2. The document also stated (emphasis in original):

> Since summer of 2008, we have suspended our fees on the fund and our [sic] currently working many hours per week in order to create a liquidity event to begin a cash flow back to the investors. In addition, we are paying for the accounting costs of K-1 preparation and tax returns from Kenilworth Asset Management and NOT from the fund. We are disappointed in the performance of the fund to date, but we are seeing some positive movements in the business plans of the individual investments.

> We receive many phone calls from investors seeking a withdrawal of their capital. It is our goal to work to that end in a timely manner. IT SHOULD BE NOTED THAT OUR PERSONAL MONEY IS AT RISK IN THESE FUNDS. WE ARE ANXIOUS TO CLOSE THESE FUNDS QUICKLY AND MAKE DISTRIBUTIONS TO INVESTORS. While we understand that this Fund has been struggling we have worked through the issues with our largest investments and are working to create a liquidity event so we can return capital to investors.

24. Letters dated November 20, 2012 were sent by the principals of Kenilworth Asset Management to certain clients, announcing that Respondent was no longer affiliated with the business. The letters stated that Kenilworth Asset Management had no affiliation with the Funds and that Respondent created and managed the Funds outside of his role at Kenilworth Asset Management. The letters acknowledged that clients had been told by the custodian for the Funds that the clients' investment positions would need to be held elsewhere after a certain period. The letters provided contact information for Respondent, so that he could answer questions about the Funds, and

expressed a desire for Kenilworth Asset Management to continue providing other services to the clients.

## Civil Lawsuit No. 1

25. On June 29, 2005, two lawsuits filed in Cook County Circuit Court on March 28, 2005 and April 4, 2005 against Respondent, Synergy Fund, Synergy Private Capital Fund, Goldstar Private Capital Fund One, Awesome Kids, Tri-Mar and Fountech International were consolidated (the "2005 Lawsuit").

   a. The 2005 lawsuit was in regards to two promissory notes and a finder's fee agreement in connection with a real estate transaction, which were executed by: Respondent, on behalf of Synergy Fund, Synergy Private Capital Fund, and Goldstar Private Capital Fund One; Awesome Kids; Tri-Mar; and Fountech International. (Documents indicate that Respondent, individually, had a separate selling compensation agreement for his part in helping find funding for the real estate transaction.)

   b. In the process of presenting a defense and counter-claim, Respondent referred to the underlying transaction as "ill-advised and on terms that were not competitive."

   c. On or about August 17, 2006, the parties entered into a settlement agreement (the "2006 Settlement"). Respondent, on behalf of Synergy Fund, Synergy Private Capital Fund, Goldstar Private Capital Fund One, and others agreed to jointly and severally pay a total of $1.8 million to the plaintiffs.

26. On May 30, 2008, a Verified Complaint for Confession of Judgment was filed in Cook County Circuit Court against Respondent, Synergy Fund, Synergy Private Capital Fund, Goldstar Private Capital Fund One, and others (the "2008 Lawsuit") after they allegedly defaulted on payments owed under the 2006 Settlement.

27. On June 9, 2008, judgments were entered, jointly and severally, against Synergy Fund, Synergy Private Capital Fund, Goldstar Private Capital Fund One, and others for $1.07 million.

28. On August 25, 2008, a conditional judgment was entered for the same amount against Respondent as an individual.

29. A letter dated July 19, 2008, during the asset discovery process, was written by Respondent to investors in Synergy Fund. The two-paragraph letter acknowledged the recent litigation. Investors were assured that their rights were being protected by legal counsel. The letter further stated:

The lawsuit centers around an investment we made to fund real estate projects in Florida. While the borrower has made payments on the note he had asked for more time to repay the note which was agreed to by the Lender, a private group. The borrower is working to provide a payment schedule and security for the loan in order to release us from this dispute... We are expecting to work toward liquidating the Fund this year.

30. During the asset discovery process, Synergy Fund reached an agreement with MOD (the "MOD Agreement"). All of Synergy Fund's interests in MOD were sold to MOD for $50,000 on November 19, 2008. The payment went directly to the 2008 Lawsuit plaintiffs to reduce the amount owed by Synergy Fund pursuant to the June 3, 2008 judgment.

31. The KAM Private Capital Fund investment in Awesome Kids ($485,000 according to the 2011 KAM Private Capital Fund Taxes and $400,000 according to the 2012 KAM Private Capital Fund Document) was to help satisfy the amount owed by Awesome Kids pursuant to the June 3, 2008 judgment—although KAM Private Capital Fund was not a party to the lawsuit.

32. On or about October 20, 2010, a settlement agreement (the "2010 Settlement") was reached in which, pursuant to a payment plan, $150,000 would be paid to the 2008 Lawsuit plaintiffs by Synergy Fund and Synergy Private Capital Fund. Once paid, Respondent, Synergy Fund, Synergy Private Capital Fund, and Goldstar Private Capital Fund One would be released from further liability.

33. On or about April 19, 2012, another settlement agreement (the "2012 Settlement") was reached after Synergy Fund and Synergy Private Capital Fund were unable to make the scheduled payments under the 2010 Settlement. The 2012 Settlement provided that Synergy Fund, Synergy Private Capital Fund, and Goldstar Private Capital Fund would pay $125,000 pursuant to a new payment plan. Once paid, Respondent, Synergy Fund, Synergy Private Capital Fund, and Goldstar Private Capital Fund One would be released from further liability.

34. On October 24, 2013, a Confession of Judgment Complaint was filed in Cook County Circuit Court against Respondent, Synergy Fund, Synergy Private Capital Fund, Goldstar Private Capital Fund One, and others (the "2013 Lawsuit") after they allegedly defaulted on the 2012 Settlement. On March 6, 2014, judgments were entered against Synergy Fund, Synergy Private Capital Fund, Goldstar Private Capital Fund One, and others for $111,500. On June 16, 2014, a default judgment was entered against Respondent, after he failed to appear. The litigation is still ongoing.

## Civil Lawsuit No. 2

35. On September 10, 2010, a lawsuit was filed in the Northern District of Illinois by Goldstar Private Capital Fund One against Awesome Kids, Tucker's Cove, Jupiter Coastal Investments, and the Funds (the "2010 Lawsuit"). The principal of Goldstar Private Capital Fund One at the time of the alleged activity was also the chief executive officer of CFA when the Funds invested in CFA. The lawsuit was related to an investment in a real estate development project for which Jupiter Coastal Investments was the developer. The complaint alleged that Respondent, on behalf of the Funds, provided a guaranty to Goldstar Private Capital Fund One for a promissory note issued by Jupiter Coastal Investments. Respondent filed an answer, which admitted that allegation was true but denied that the Funds had not honored their obligations under the guaranty. The claims against the Funds were dismissed pursuant to a settlement agreement (the "2011 Settlement").

## Regulatory Activity

36. FINRA is a private, non-governmental organization that is registered with the SEC as a self-regulatory organization pursuant to the Securities Exchange Act of 1934.

37. At all times relevant hereto, Respondent was FINRA-registered and employed by FINRA-registered firms.

38. On March 28, 2014, FINRA entered an Order Accepting Offer of Settlement regarding File No. 2013038624802, permanently barring Respondent from associating with any FINRA member in any capacity after he failed to fully respond to a request for documents and information in violation of FINRA Rules 8210 and 2010.

39. On June 11, 2014, the SEC accepted an Offer of Settlement made by Respondent and filed an Order Instituting Public Administrative and Cease-and-Desist Proceedings (the "Order"), making findings and imposing remedial sanctions and a Cease-and-Desist Order.

40. The Order stated:

These proceedings arise out of fraud by an investment adviser in connection with the offer and sale of promissory note securities. Between April and September 2011; Acri, as the controlling managing member of Commission-registered investment adviser Kenilworth Asset Management LLC ("Kenilworth"), defrauded Kenilworth's investment advisory clients in the offer and sale of $240,000 in promissory note securities of Prairie Common Holdings LLC ("Prairie"). Acri told clients that their funds

would be used in the development of a retail parcel located near Hammond, Indiana, and that their investments would be secured by real estate. Acri, however, misappropriated $41,250 of the total proceeds, and the investments were never secured. Acri also failed to disclose material information to advisory clients concerning: (1) a conflict of interest arising from his motivation to engage in the offering to help other Kenilworth advisory clients recover on a prior, delinquent $500,000 loan to Praedium Development Corporation ("Praedium"), Prairie's developer; (2) the distressed financial condition of the real estate development project of which Prairie was a part, Praedium, and a Praedium principal; and (3) the five percent commission Kenilworth would receive on sales of the securities, which totaled $13,750. Based on these actions, Acri willfully violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Advisers Act.

41. The $500,000 loan to Praedium was in the form of a promissory note issued to the KAM Private Fund and identified in the 2012 KAM Private Fund Document as an investment in Woodmar Hammond.

42. In addition to the Cease-and-Desist Order, Respondent was sanctioned by the SEC as follows:

a. Barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization;

b. Prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter;

c. Barred from participating in any offering of a penny stock, including: acting as a promoter, finder, consultant, agent or other person who engages in activities with a broker, dealer or issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock; and

d. Denied the privilege of appearing or practicing before the Commission as an attorney.

43. The SEC ordered Respondent to pay disgorgement of $55,000, prejudgment interest of $4,478.96, and a civil monetary penalty in the amount of $55,000 to the SEC.

## Violative Conduct

44. As an investment adviser representative, Respondent has a fiduciary duty, owes his clients undivided loyalty, and may not engage in activity that conflicts with a client's interest without the client's consent. However, Respondent failed to protect investors' rights and their best interests, failed to disclose conflicts of interests, and failed to act ethically. Respondent misled, defrauded, deceived, and manipulated investors.

   a. Respondent did not abide by the provisions in the private placement memorandums, but the private placement memorandums were not corrected. As a result, material facts became misleading and false.

      i. Respondent came to have complete control over all management decisions.

      ii. Respondent changed the investment strategy. Investments became increasingly high risk and focused solely on private companies. All of the Funds became 100% invested in private debt and equity securities, offered by Respondent's friends and acquaintances.

      iii. Income distributions were minimal to nonexistent.

      iv. Promissory notes were rarely secured or recorded.

      v. Respondent didn't conduct due diligence, there was no intensive analysis, and the portfolio companies were not carefully monitored.

      vi. Respondent overstated his performance history with the Synergy Fund.

   b. Respondent failed to tell investors of his relationships with the operators of the portfolio companies, the operating history of the portfolio companies and their operators (i.e., inability to make payments, personal bankruptcies, lack of valuable assets, etc.), and selling compensation arrangements.

   c. Respondent made disbursements to select investors, at his discretion, without notice to, or consideration of, the other investors.

   d. Respondent failed to tell investors how investment funds would be used by the portfolio companies.

   e. Respondent failed to tell investors that the reason management fees were suspended and accounting costs were being paid by Kenilworth Asset

Management was because the Funds ran out of cash and had no reasonable expectation of payments from the portfolio companies.

f.  Information provided by Respondent about the value of the investments varied and was inconsistent. *Compare* Appendix, Tables 1 and 2.

g.  Respondent presented the investments in Awesome Kids, Fountech International, and Pacific Phoenix as if the companies were not operated by the same people (the "Awesome Kids operators") to justify repeated investments despite the Awesome Kids operators' poor performance history.

    i.  According to the 2011 taxes, Synergy Fund invested $2.1 million and KAM Private Capital Fund invested $485,000 with the Awesome Kids operators. *See* Appendix, Table 3.

    ii. According to the 2011 Synergy Fund Document, 2012 KAM Private Capital Fund Document, and 2012 Synergy Private Capital Fund Document, the amounts invested with the Awesome Kids operators were $1.5 million, $400,000, and $2.5 million (respectively). *See* Appendix, Table 4.

h.  Respondent presented the investments in Praedium Development, Quentin Woods, Gannett Capital, and Woodmar Hammond as if the companies were not operated by the same people (the "Praedium operators") to justify repeated investments despite the Praedium operators' poor performance history.

    i.  According to the 2011 taxes, KAM Private Capital Fund invested $620,000 with the Praedium operators. *See* Appendix, Table 5.

    ii. According to the 2012 KAM Private Capital Fund Document, 2011 Synergy Fund Document, and 2012 Synergy Private Capital Fund Document, the amounts invested with the Praedium operators were $525,000, $25,000, and $25,000 (respectively). *See* Appendix, Table 6.

i.  Respondent accepted the last investors in the KAM Private Capital Fund for the purpose of providing additional money to Awesome Kids for a lawsuit settlement payment and to allow Praedium to pay back a debt owed to one of Respondent's clients in a transaction that was unrelated to KAM Private Capital Fund, but did not inform the investors of that purpose.

45. Respondent failed to have reasonable and documented bases for representations which falsely lulled investors into believing that the portfolio companies were in the

process of turning around their fortunes with Respondent's help and just needed time to begin making payments to the Funds.

a. Respondent failed to keep investors informed or to provide accurate information about the 2005, 2008, 2010, and 2013 Lawsuits; 2006, 2010, 2011, and 2012 Settlements; and amounts owed or paid by the Funds as a result of the lawsuits and settlements, including payments to legal counsel and plaintiffs.

b. Respondent failed to tell investors pertinent details about encumbrances on the Funds (i.e., guarantees for the performance of portfolio companies that had previously defaulted on payments to the Funds).

c. Respondent reported the original nominal value of investments to investors, without acknowledging any possible adjustments related to the portfolio companies performance or ability to make payments.

46. Furthermore, Respondent failed to adequately maintain books and records.

a. Recordkeeping for the Funds was unorganized, inconsistent, and inadequate, according to the Department's investigation and on-site examination.

b. Documentation for transactions often was inaccurate and did not reflect Respondent's understanding of the transactions, as allegedly discussed in personal, nonbinding conversations with the portfolio companies operators.

c. Respondent represented that Synergy Fund had $700,000 invested in MOD in the 2011 Synergy Fund Document ($735,000 according to the 2011 Synergy Fund Taxes). However, according to the MOD Agreement, Synergy Fund no longer had any interest in MOD. The MOD Agreement did not reference any Synergy Private Capital Fund interest in MOD (identified in the 2012 Synergy Private Capital Fund Document as a current investment of $225,000). *See* Appendix, Tables 1 and 2.

d. Respondent has indicated that Synergy Private Capital Fund had no cash in 2011 (despite the 2011 Synergy Private Capital Fund Taxes). In fact, all of the Funds' bank accounts were closed (in July 2006 for Synergy Private Capital Fund, June 2008 for Synergy Fund, and January 2010 for KAM Private Fund).

47. As a result of the repeated failures, Respondent has demonstrated an inability to properly conduct business.

## Violations and Sanctions

48. Section 8.E(1)(b) of the Act provides, *inter alia*, that the registration of an investment adviser representative may be suspended or revoked if the Secretary of State finds that such investment adviser representative has engaged in any unethical practice in connection with any security, the offer or sale of securities, or in any fraudulent business practice.

49. Section 8.E(1)(j) of the Act provides, *inter alia*, that the registration of an investment adviser representative may be suspended or revoked if the Secretary of State finds that such investment adviser representative has had membership in or association with any self-regulatory organization registered under the Federal 1934 Act or the Federal 1974 Act suspended, revoked, refused, expelled, cancelled, barred, limited in any capacity, or otherwise adversely affected in a similar manner arising from any fraudulent or deceptive act or a practice in violation of any rule, regulation, or standard duly promulgated by the self-regulatory organization.

50. Section 8.E(1)(k) of the Act provides, *inter alia*, that the registration of an investment adviser representative may be suspended or revoked if the Secretary of State finds that such investment adviser representative has had any order entered against it after notice and opportunity for hearing by a securities agency of any state, any foreign government or agency thereof, the SEC, or the Federal Commodities Futures Trading Commission arising from any fraudulent or deceptive act or a practice in violation of any statute, rule, or regulation administered or promulgated by the agency or commission.

51. Section 8.E(1)(m) of the Act provides, *inter alia*, that conducting a continuing course of dealing of such nature as to demonstrate an inability to properly conduct the business of an investment adviser or investment adviser representative constitutes grounds for sanction.

52. Section 8.E(1)(q) of the Act provides, *inter alia*, that the registration of an investment adviser representative may be suspended or revoked if the Secretary of State finds that such investment adviser representative has failed to maintain the books and records required under the Act or rules or regulations promulgated under the Act or under any requirements established by the SEC or a self-regulatory organization.

53. By virtue of the foregoing, the Respondent's registration as an investment adviser representative is subject to suspension or revocation pursuant to Sections 8.E(1)(b), (j), (k), (m) and (q) of the Act.

54. Section 12.A of the Act provides, *inter alia*, that it shall be a violation of the Act to offer or sell any security except in accordance with the Act.

55. Section 12.G of the Act provides, *inter alia*, that it shall be a violation of the Act to obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

56. Section 12.H of the Act provides, *inter alia*, that it shall be a violation of the Act to sign or circulate any statement, prospectus or other paper or document pertaining to any security, knowing or having reasonable grounds to know any material representation therein contained to be false or untrue.

57. Section 12.J of the Act provides, *inter alia*, that it shall be a violation of the Act to do the following, while acting as an investment adviser representative, by any means or instrumentality, directly or indirectly:

    (i) employ any device, scheme, or artifice to defraud any client or prospective client;

    (ii) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; or

    (iii) engage in any act, practice or course of business which is fraudulent, deceptive, or manipulative.

58. By virtue of the foregoing, the Respondent has violated Sections 12.A, G, H, and J of the Act.

59. Section 11.F(2) of the Act provides, *inter alia*, that the Secretary of State may temporarily suspend, for a maximum period of 90 days, by an order effective immediately, the registration of an investment adviser representative without notice and prior hearing, if the Secretary of State shall in his opinion, based on credible evidence, deem it necessary to prevent an imminent violation of the Act or to prevent losses to investors which the Secretary of State reasonably believes will occur as a result of a prior violation of the Act.

60. The entry of this **Temporary Order of Suspension and Prohibition**, suspending the registration of Respondent, Robert C. Acri, as an investment adviser representative in the State of Illinois and prohibiting Respondent, Robert C. Acri, from offering or selling securities in the State of Illinois, is in the public interest, for the protection of the investing public and consistent with the purposes intended by the provisions of the Act.

61. The foregoing findings are based upon credible evidence.

NOW THEREFORE, IT IS HEREBY ORDERED THAT: pursuant to the authority granted by Section 11.F of the Act, for a maximum period of 90 days,

I.   The registration of Respondent, Robert C. Acri, as an investment adviser representative in the State of Illinois is **TEMPORARILY SUSPENDED**; and

II.  Respondent, Robert C. Acri, is **TEMPORARILY PROHIBITED** from offering or selling securities the State of Illinois.

NOTICE is hereby given that the Respondent may request a hearing on this matter by transmitting such request in writing to the Director, Illinois Securities Department, 300 W. Jefferson St., Suite 300A, Springfield, Illinois 62702. Such request must be made within thirty (30) days of the date of entry of this Order. Upon receipt of a request for hearing, a hearing will be scheduled. A request for hearing will not stop the effectiveness of this Order and will extend the effectiveness of this Order for 60 days from the date the hearing request is received by the Department.

FAILURE BY ANY RESPONDENT TO REQUEST A HEARING WITHIN THIRTY (30) DAYS AFTER ENTRY OF THIS ORDER OF SUSPENSION SHALL CONSTITUTE AN ADMISSION OF ANY FACTS ALLEGED HEREIN AND CONSTITUTE SUFFICIENT BASIS TO MAKE THIS ORDER FINAL.

ENTERED: This 1st day of July, 2014.

JESSE WHITE
Secretary of State
State of Illinois

Attorney for the Secretary of State:

Shannon Bond
Illinois Securities Department
300 W. Jefferson St., Suite 300A
Springfield, Illinois 62702
Telephone: (217) 524-0648

## Appendix

Table 1. Investment valuations, as provided in the 2011 Tax Records.

| | Synergy | Synergy PC | KAM PC | Totals |
|---|---|---|---|---|
| Cash | $ 5 | $ 4,500,000 | $ 118 | $ 4,500,123 |
| Awesome Kids | $ 1,300,000 | - | $ 485,000 | $ 1,785,000 |
| Fountech Int'l | $ 100,000 | - | - | $ 100,000 |
| Pacific Phoenix | $ 700,000 | - | - | $ 700,000 |
| MM | $ 96,500 | - | - | $ 96,500 |
| MOD | $ 735,000 | - | - | $ 735,000 |
| CFA | - | - | - | $ - |
| Synergy PC | $ 1,200,000 | - | $ 47,000 | $ 1,247,000 |
| Praedium Dev. | - | - | $ 560,000 | $ 560,000 |
| Quentin Woods | - | - | $ 35,000 | $ 35,000 |
| Gannett Capital | - | - | $ 25,000 | $ 25,000 |
| Woodmar Hammond | - | - | - | $ - |
| Totals | $ 4,131,505 | $ 4,500,000 | $ 1,152,118 | $ 9,783,623 |

Table 2. Investment valuations, as provided in the 2011/2012 Documents.

| | Synergy | Synergy PC | KAM PC | Totals |
|---|---|---|---|---|
| Cash | - | - | - | $ - |
| Awesome Kids | $ 1,500,000 | $ 2,500,000 | $ 400,000 | $ 4,400,000 |
| Fountech Int'l | - | - | - | $ - |
| Pacific Phoenix | - | - | - | $ - |
| MM | - | - | - | $ - |
| MOD | $ 700,000 | $ 225,000 | - | $ 925,000 |
| CFA | $ 250,000 | $ 250,000 | - | $ 500,000 |
| Synergy PC | $ 1,500,000 | - | - | $ 1,500,000 |
| Praedium Dev. | - | - | - | $ - |
| Quentin Woods | $ 25,000 | $ 25,000 | $ 25,000 | $ 75,000 |
| Gannett Capital | - | - | - | $ - |
| Woodmar Hammond | - | - | $ 500,000 | $ 500,000 |
| Totals | $ 3,975,000 | $ 3,000,000 | $ 925,000 | $ 7,900,000 |

Table 3. Values of investments with the Awesome Kids operators, as provided in the 2011 Tax Records.

|  | Synergy | Synergy PC | KAM PC | Totals |
|---|---|---|---|---|
| Awesome Kids | $ 1,300,000 | - | $ 485,000 | $ 1,785,000 |
| Fountech Int'l | $ 100,000 | - | - | $ 100,000 |
| Pacific Phoenix | $ 700,000 | - | - | $ 700,000 |
| Totals | $ 2,100,000 | $ - | $ 485,000 | $ 2,585,000 |

Table 4. Values of investments with the Awesome Kids operators, as provided in the 2011/2012 Documents.

|  | Synergy | Synergy PC | KAM PC | Totals |
|---|---|---|---|---|
| Awesome Kids | $ 1,500,000 | $ 2,500,000 | $ 400,000 | $ 4,400,000 |
| Fountech Int'l | - | - | - | $ - |
| Pacific Phoenix | - | - | - | $ - |
| Totals | $ 1,500,000 | $ 2,500,000 | $ 400,000 | $ 4,400,000 |

Table 5. Values of investments with the Praedium operators, as provided in the 2011 Tax Records.

|  | Synergy | Synergy PC | KAM PC | Totals |
|---|---|---|---|---|
| Praedium Dev. | - | - | $ 560,000 | $ 560,000 |
| Quentin Woods | - | - | $ 35,000 | $ 35,000 |
| Gannett Capital | - | - | $ 25,000 | $ 25,000 |
| Woodmar Hammond | - | - | - | $ - |
| Totals | $ - | $ - | $ 620,000 | $ 620,000 |

Table 6. Values of investments with the Praedium operators, as provided in the 2011/2012 Documents.

|  | Synergy | Synergy PC | KAM PC | Totals |
|---|---|---|---|---|
| Praedium Dev. | - | - | - | $ - |
| Quentin Woods | $ 25,000 | $ 25,000 | $ 25,000 | $ 75,000 |
| Gannett Capital | - | - | - | $ - |
| Woodmar Hammond | - | - | $ 500,000 | $ 500,000 |
| Totals | $ 25,000 | $ 25,000 | $ 525,000 | $ 575,000 |