UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL HOLLERICH and LAURA HOLLERICH, | |
| Plaintiffs, | No. 14 CV 10411 |
| v. | Judge Manish S. Shah |
| ROBERT C. ACRI, KENILWORTH ASSET MANAGEMENT, LLC, QUENTIN WOODS CORPORATION, PRAEDIUM DEVELOPMENT CORP., KAM PRIVATE FUND, LLC, and WOODMAR HAMMOND, LLC, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Michael and Laura Hollerich followed advice from their registered investment advisers, defendants Robert Acri and Kenilworth Asset Management, to invest in two real estate development projects. After investigations by FINRA, the SEC, and the Illinois Secretary of State, Acri was banned from the securities industry. The Hollerichs brought this action against Acri and Kenilworth for violating the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Illinois Securities Act, and common law fiduciary duties. The Hollerichs move for summary judgment on those claims with respect to Kenilworth. For the following reasons, the motion for summary judgment is granted.

## I.    Background

### A.    Procedural Posture

Defendants in this case have been largely unresponsive. The Hollerichs have filed several motions for default judgment against both Acri and Kenilworth. *See* [23]; [32]; [54]; [68]; [70].[1] One such motion was successful; I granted a motion for default judgment against Acri and I entered an order of judgment against him. [72]. As for Kenilworth, I denied the Hollerichs' motion for default judgment and I did not enter an order of judgment against Kenilworth. [62]. I also vacated the technical defaults against Kenilworth and I ordered Kenilworth to pay the Hollerichs' reasonable fees and costs.[2] [62].

Despite being given a chance to defend the case, and even after being sanctioned, Kenilworth failed to file a response to the Hollerichs' motion for summary judgment or a response to the Hollerichs' Local Rule 56.1 statement of facts.[3] The Hollerichs' "reply" brief requests that their statement of facts be deemed admitted and that their motion be granted. *See* [114] at 1–2. That request is denied in part. The absence of Kenilworth's responses does not relieve the Hollerichs of their burden of persuasion; the Hollerichs still must show that they are entitled to

---

[1] Bracketed numbers refer to entries on the district court docket.

[2] I ordered Kenilworth to pay the Hollerichs $3,710 as a sanction for avoiding service of process while it was aware of the pending litigation. [85]. As of the filing of their motion for summary judgment, the Hollerichs say that Kenilworth has failed to pay this amount. [107] at 14.

[3] The Hollerichs filed their motion for summary judgment on December 12, 2016. *See* [106]. The court set a briefing schedule for that motion. *See* [105]. Kenilworth twice asked for more time to respond, and I granted those requests. [110]; [113]. In the end, Kenilworth never responded.

judgment as a matter of law. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). It appears that very little effort went into drafting the Hollerichs' complaint and statement of facts. Both documents largely consist of copied and pasted portions of the SEC's cease and desist order. *See* [1], [107-1] at 17–24. Those same portions of copied text also appear in Mr. Hollerich's declaration, *see* [107-1] at 1–13, which the Hollerichs repeatedly cite in their statement of facts. Although Kenilworth's failure to respond means that the material facts set forth in the Hollerichs' statement of facts will be deemed admitted, that is only true to the extent that the facts are supported by evidence in the record. N.D. Ill. L.R. 56.1(b)(3)(C); s*ee also Raymond*, 442 F.3d at 608. Furthermore, Kenilworth's failure to respond operates as a waiver of any objections to the admissibility of the Hollerichs' supporting evidence.

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute over a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Facts are construed and all reasonable inferences are drawn in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

B.    **Acri's and Kenilworth's Investment History**

Acri was a broker-dealer registered with the SEC. [107-1] at 19; [119] ¶ 10. In 2002, Acri founded the firm Kenilworth, an investment adviser registered with the SEC. *Id.* For ten years, Acri controlled Kenilworth: he maintained its bank

accounts, hired its employees, determined its policies and practices, and he made decisions about what investments should be offered to its clients. *Id.* ¶ 11. In February 2012, Clayton Lawrie[4] took control over Kenilworth's accounts. *Id.* ¶ 72. Six months later, Acri resigned as a principal and terminated his ownership of Kenilworth. [107-1] at 19. Lawrie continued to manage the firm until 2014. *Id.* ¶ 66.

Before he resigned, Acri convinced the Hollerichs to transfer a large portion of their assets to Kenilworth in 2009, so that he could advise them in their investments. *Id.* ¶ 19. Lawrie also helped bring the Hollerichs in as clients of Kenilworth. *Id.* ¶ 74. Approximately two years later, Acri recommended that they invest in the Woodmar Project, a plan to develop a parcel for retail near Hammond, Indiana. *Id.* ¶¶ 20, 22. Acri did not tell the Hollerichs whether Praedium, Woodmar Hammond, or Prairie[5] issued the promissory note, *id.* ¶ 21, but he stated that the note had more than a fifty percent loan-to-value ratio, that it would be secured by certain real estate, and that it bore a fifteen percent annual interest rate. *Id.* ¶¶ 20–21. As a result, the Hollerichs followed Acri's advice and they invested $25,000 in the Woodmar Project. *Id.* ¶ 22. Despite the Hollerichs' repeated demands, Acri never provided them with a copy of the promissory note. *Id.* ¶ 23.

Acri also recommended that the Hollerichs invest in the Quentin Woods Corporation project, a plan to develop a parcel for an assisted living facility in the Village of Palatine, Illinois. *Id.* ¶¶ 6, 30. Acri showed the Hollerichs QWC's building

---

[4] Lawrie had worked for Kenilworth since 2003. *Id.* ¶ 66.

[5] Praedium Development Corporation, Woodmar Hammond, LLC, and Prairie Common Holdings are all Illinois corporations and real estate development/holding companies that are under common management with each other. [107-1] at 28.

plans and he explained that the only obstacle to the project was the zoning permit, but Acri assured the Hollerichs that the permit would be granted soon. *Id.* ¶ 32. Once the building was complete, Acri told the Hollerichs that they would have the option of receiving payment in full on their promissory notes or to convert their investment into an ownership stake in the facility, which meant the Hollerichs would be equity owners in the business. *Id.* Again, the Hollerichs took Acri's advice and invested $150,000 with QWC. *Id.* ¶¶ 33–34; [107-1] at 10; [107-2] at 5. Acri prepared and executed the agreements between QWC and the Hollerichs, [119] ¶ 35, because Acri was the president and a shareholder of QWC. *Id.* ¶ 6.

When the QWC project did not progress as planned, Acri told the Hollerichs that he gave Joan DeSouza, who Acri referred to as a developer and a consultant, approximately $120,000 of their investment as a "down-payment" for her services in advancing the project. *Id.* ¶ 51. Later on, Acri informed the Hollerichs that the zoning permit had not been approved and that he was working with DeSouza to get the Hollerichs' money refunded.[6] *Id.* ¶ 52. The Hollerichs believe that QWC never submitted a zoning permit or pursued its approval with the Village of Palatine. *Id.* The Hollerichs requested proof of Acri's communications with DeSouza, but he never supplied any such documentation. *Id.* ¶ 53. Instead, Acri suggested that Mr. Hollerich sue DeSouza because DeSouza no longer had the Hollerichs' funds.

---

[6] The Hollerichs do not make any claims that Acri gave their money to DeSouza without their permission or over their objections. Absent further information, Acri's payment to DeSouza does not support the Hollerichs' claims against Acri.

*Id.* ¶ 57. Acri also recommended that Mr. Hollerich take control of QWC and invest more money into the project.[7] *Id.* ¶ 54.

The Hollerichs requested records relating to their investments in the Woodmar Project and the QWC project, but Acri and Kenilworth never complied. *Id.* ¶ 50. The Hollerichs sent letters to Acri to notify him of the outstanding loan amounts and interest for the promissory notes, *id.* ¶ 61, and of the breaches to the QWC agreements, *id.* ¶ 58. Eventually, the Hollerichs began moving their money, approximately $500,000, out of Acri and Kenilworth's control. *Id.* ¶ 55. The Hollerichs say they never received any payment on their contracts or other promised consideration for their $175,000 worth of investments through Kenilworth in the Woodmar Project and the QWC project. *Id.* ¶ 63.

In 2013, FINRA began investigating Acri's involvement in the sale of alternative investments and defaulted promissory notes. *Id.* ¶ 37. This investigation led to FINRA permanently barring Acri from associating with any FINRA member in any capacity. *Id.* ¶ 38. The following year, the SEC examined potential misconduct by Acri involving Kenilworth's clients, *id.* ¶ 39, and it published a press release titled "Chicago-Area Attorney Charged After SEC Exam Spots Fraud in Real Estate Investment Offering." *Id.* ¶ 41. The SEC also issued a cease and desist order that imposed a remedial sanction on Acri: $55,000 for disgorgement,

---

[7] In their opening memorandum, the Hollerichs make other allegations against Acri with respect to their investment in QWC, but those assertions are missing from the statement of facts and are not supported by the evidence; therefore, they will be disregarded. *See* [107] at 3 ("Acri failed to inform the Plaintiffs that certain of their investments would be used to pay back taxes [. . .]. Acri stated that he (and presumably QWC) had a lobbyist working on his behalf with the Village of Palatine in order to obtain zoning approval [. . .]. Acri even referenced [. . .] that QWC would get zoning approval by the end of 2012.").

$4,478.96 for prejudgment interest, and $55,000 for a civil money penalty. *Id.*; [107-1] at 23. This order is the basis for the Hollerichs' complaints against Kenilworth with respect to their investments in the Woodmar Project. A summary of the SEC's findings is as follows:

> Between April and September 2011, Acri, as the controlling managing member of Commission-registered investment adviser Kenilworth Asset Management LLC ("Kenilworth"), defrauded Kenilworth's investment advisory clients in the offer and sale of $240,000 in promissory note securities of Prairie Common Holdings LLC ("Prairie"). Acri told clients that their funds would be used in the development of a retail parcel located near Hammond, Indiana, and that their investments would be secured by real estate. Acri, however, misappropriated $41,250 of the total proceeds, and the investments were never secured. Acri also failed to disclose material information to advisory clients concerning: (1) a conflict of interest arising from his motivation to engage in the offering to help other Kenilworth advisory clients recover on a prior, delinquent $500,000 loan to Praedium Development Corporation ("Praedium"), Prairie's developer; (2) the distressed financial condition of the real estate development project of which Prairie was a part, Praedium, and a Praedium principal; and (3) the five percent commission Kenilworth would receive on sales of the securities, which totaled $13,750. Based on these actions, Acri willfully violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Advisers Act.

[107-1] at 18. The Illinois Secretary of State also issued a Final Order of Suspension and Prohibition as to Acri for his unlawful conduct.[8] [119] ¶ 49. Finally, a grand jury in the Circuit Court of DuPage County indicted Acri in 2015 for securities fraud for "knowingly engag[ing] in a course of business in connection with the sale of a

---

[8] The preceding Temporary Order found that Acri failed to act as a fiduciary, falsely lured investors, and kept inadequate records, and thus, there was cause to impose sanctions against him under the Illinois Securities Law, 815 ICLS 5/1, *et seq. Id.* ¶ 46.

security, under [several] names [including] the KAM Private Fund, which tended to work a fraud or deceit on the purchaser thereof." [107-7] at 2.

## II.    Analysis

### A.    Violations of the Securities Exchange Act of 1934

An action under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the Securities and Exchange Commission's Rule 10b–5, 17 C.F.R. § 240.10b–5, requires proof of the following elements: (1) material misrepresentation or omission by the defendant; (2) scienter; (3) connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.[9] *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 414 (7th Cir. 2015), *reh'g denied* (July 1, 2015) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2407 (2014).

The Hollerichs established each of the five elements for both the Woodmar Project and the QWC project. Turning first to the Woodmar Project, the Hollerichs demonstrated that defendants misrepresented that investment opportunity as low risk and as secured by certain real estate, when in fact the opposite was true. Additionally, the Hollerichs showed that the defendants omitted information about the conflict of interest defendants had with Praedium and the Woodmar Project—

---

[9] Information is material if a reasonable person would consider it important in deciding whether to invest. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). Scienter encompasses an "intent to deceive, manipulate, or defraud." *Aaron v. Sec. & Exch. Comm'n*, 446 U.S. 680, 686 n.5 (1980). To prove loss causation, a plaintiff must show that "'but for the circumstances that the fraud concealed, the investment [. . .] would not have lost its value.'" *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648–49 (7th Cir. 1997) (quoting *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 683 (7th Cir. 1990)).

both in terms of defendants' incentive to ensure Praedium's ability to repay the prior $500,000 loan and in terms of the commission defendants would receive on the sale of Prairie's securities—and about Praedium's dire financial condition, which affected the viability of the Woodmar Project. These are, without dispute, facts that a reasonable investor would consider important; they were material.

Kenilworth's intention to deceive, manipulate, and defraud the Hollerichs is the only reasonable inference to be drawn from the undisputed facts surrounding the investment transaction. At the time Acri recommended that the Hollerichs invest in the Woodmar Project, Acri and, therefore, Kenilworth, were well aware that: (1) Praedium was delinquent on its $500,000 loan payments, (2) the Woodmar Project was financially doomed, and (3) defendants would receive a commission if they sold Prairie securities. Despite this knowledge and their duties as investment advisers, defendants deliberately concealed this information from the Hollerichs and described the Woodmar Project in drastically different terms—as a positive investment opportunity. The defendants hid these facts and invented a different story to tell the Hollerichs because defendants needed money to repay their clients for the losses sustained in the earlier investment in Praedium and because they wanted commission payments.

There is a direct connection between the sale of Prairie's securities and defendants' misrepresentations and omissions. The Hollerichs made clear that defendants' misrepresentations and omissions caused them to invest in the Woodmar Project. Relatedly, the Hollerichs established that they relied on

9

defendants' misrepresentations and omissions in making their decision to invest. Had they known the truth surrounding the Woodmar Project, they would not have invested their money in it. This regrettable reliance resulted in the Hollerichs never receiving any payment or other promised consideration for their $25,000 investment. The elements of connection, reliance, and economic loss are all satisfied.

Finally, the Hollerichs established the element of loss causation. Defendants' fraud concealed circumstances about the financial instability of the Woodmar Project and of Praedium and Prairie. Those circumstances, and not external or intervening factors, caused the Hollerichs' damage with respect to their $25,000 investment in the Woodmar Project.

Turning next to the QWC project, the Hollerichs established that Kenilworth (acting through Acri) advertised the QWC project by confirming for the Hollerichs that the only impediment to the project was the zoning permit and that the permit would be granted soon. Kenilworth does not dispute that QWC never actually pursued a zoning permit with the Village of Palatine. Consequently, this constitutes a material misrepresentation by the defendants and leads to a similarly indisputable conclusion that Kenilworth acted with the requisite intent to defraud—it lied to get the Hollerichs' money.

A connection exists between defendants' misrepresentation and sale of the QWC security. In order to get the Hollerichs money, defendants needed to convince the Hollerichs that investing in the QWC project was wise. Defendants

10

characterized the QWC project as an attractive investment by misrepresenting to the Hollerichs that the only impediment to the project's success would soon be eliminated. The Hollerichs relied on this information in deciding to invest in the QWC project; had they known that a zoning permit had not been pursued and would not be approved, they would not have invested in that project. As a result, the Hollerichs have suffered an economic loss: they never received the consideration defendants promised them for their $150,000 investment. The Hollerichs also satisfied the final element of loss causation. Defendants' fraud concealed the unlikelihood that the QWC project would go forward and ultimately, the failure of the QWC project to get off the ground caused the Hollerichs' loss. Accordingly, defendants are liable under § 10(b) and Rule 10b–5 for their fraudulent acts in facilitating the Hollerichs' investment in the Woodmar Project and the QWC project. The Hollerichs are entitled to damages. *Halliburton*, 134 S. Ct. at 2407 (Rule 10b-5 allows buyer to seek damages from seller for making material misrepresentations in connection with sale of securities).

### B.   Violations of the Illinois Securities Act of 1953

Under the Illinois Securities Act of 1953, it is unlawful to "obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission." 815 ILCS 5/12(G). The state law parallels federal securities statutes, *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 464 (7th Cir. 2014), but it does not require proof of loss causation or scienter as they do. *Lucas v. Downtown Greenville Inv'rs Ltd. P'ship*, 284 Ill.App.3d 37, 52 (1996); *Foster v. Alex*, 213 Ill.App.3d 1001, 1005–06 (1991). Actions under the state law only

11

require proof that the defendants: (1) made a material misstatement or omission, (2) in connection with the purchase or sale of securities, (3) upon which the plaintiffs relied. *Tirapelli v. Advanced Equities, Inc.*, 351 Ill.App.3d 450, 455 (2004).

The same undisputed evidence of federal securities fraud demonstrates a violation of Illinois law. Defendants made material misrepresentations and omissions in connection with the sale of securities and the Hollerichs proved that they relied on those statements. Kenilworth is liable under the Illinois Securities Law for its actions concerning the Hollerichs investments in the Woodmar Project and the QWC project. Remedies include "rescission of any sales or purchases of securities determined to be unlawful under this Act, and [assessment of] costs of the proceedings against the defendant." 815 ILCS 5/13(G)(1); *see also Lucas*, 284 Ill.App.3d at 51. I grant the Hollerichs' request to rescind their investment adviser agreement with Acri and Kenilworth. The Hollerichs are also entitled to recover the costs they incurred litigating this issue against defendants.

### C. Violations of Common Law Fiduciary Duties

To prevail on a claim for breach of fiduciary duty under Illinois law, the Hollerichs must prove: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damages proximately caused by that breach. *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006) (citing *Neade v. Portes*, 193 Ill.2d 433, 444 (2000)). An investment adviser is not automatically a fiduciary of his advisee. *Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir. 1992) *as amended on denial of reh'g* (May 1, 1992). A fiduciary duty may arise in such a relationship when the advisee places trust and confidence in the adviser such that the adviser has gained

12

influence and superiority over the advisee. *See In re Estate of Feinberg*, 2014 Ill.App.1st 112219, ¶ 32 (1st Dist. 2014); *see Simon v. Wilson*, 291 Ill.App.3d 495, 503 (1st Dist. 1997). That is what happened in this case. After being solicited by defendants, the Hollerichs entrusted defendants with approximately $500,000 of their personal funds and placed their confidence in defendants' ability to invest those funds to yield returns. *See also United States v. Bloom*, 846 F.3d 243, 247 (7th Cir. 2017) (registered investment advisers owe clients fiduciary duties) (citing *Sec. & Exch. Comm'n v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963)). For the same reasons defendants violated the federal and state securities laws, defendants also breached the common law fiduciary duties they owed to the Hollerichs. Thus, the Hollerichs are entitled to an award of damages.

## D.    Violations of the Investment Advisers Act of 1940

Congress enacted the Investment Advisers Act of 1940, 15 U.S.C. § 80b–1 *et seq.*, to address abuses in the investment advisers industry. *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 12–13 (1979). Section 206 of the act establishes "federal fiduciary standards" to govern the conduct of investment advisers. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 471 n.11 (1977). Section 206(1) prohibits registered investment advisers from employing any device, scheme, or artifice to defraud any client or prospective client. 15 U.S.C. § 80b–6(1). Section 206(2) prohibits any transaction, practice, or course of business which operates as a fraud or deceit upon a client or prospective client. 15 U.S.C. § 80b–6(2). Although § 206(1) requires a reckless intent to deceive or defraud, *Robin v. Arthur Young &*

13

*Co.*, 915 F.2d 1120, 1126 (7th Cir. 1990), § 206(2) does not contain a scienter requirement. *Capital Gains*, 375 U.S. at 195.

It is clear from the record that Kenilworth was a registered investment adviser with the SEC and that it concealed information from the Hollerichs in order to induce them to invest in the Woodmar Project and the QWC project. Based on the facts above concerning defendants' relationship with and representations to the Hollerichs, Kenilworth violated § 206(1) and (2). *See Capital Gains*, 375 U.S. at 200 (an investment adviser engaged in fraud under the act by failing to disclose material information). The act permits the Hollerichs to void their contract with defendants, but it does not allow them to pursue any other private causes of action, legal or equitable. *See Transamerica*, 444 U.S. at 24. The Hollerichs have requested that I rescind their investment adviser agreement with defendants, and I again grant this request.

## III. Remedies

Based on the foregoing, the Hollerichs are entitled to: (1) rescission of their investment adviser agreement with defendants; (2) their actual damages; (3) their attorneys' fees and costs; and (4) prejudgment interest. Punitive damages are available in common law fraud actions, but the Hollerichs have not established that they are entitled to punitive damages as a matter of law, on summary judgment. In their briefs, the Hollerichs merely request an award for punitive damages without showing how the defendants' representations were wanton or willful, such that further punishment was necessary. *Anthony v. Sec. Pac. Fin. Servs., Inc.*, 75 F.3d 311, 316 (7th Cir. 1996) (Illinois courts disfavor punitive damages); *Home Sav. &*

14

*Loan Ass'n of Joliet v. Schneider*, 108 Ill.2d 277, 284 (1985) ("a punitive damage award [. . .] may be allowed 'where the wrong involves some violation of duty springing from a relation of trust or confidence, or where the fraud is gross, or the case presents other extraordinary or exceptional circumstances clearly showing malice and willfulness.'").

The Hollerichs should file a motion to prove up their compensatory damages, attorneys' fees and costs, and prejudgment interest as they relate to the claims involving the Woodmar Project and the QWC project.

## IV. Conclusion

The Hollerichs' motion for summary judgment, [106], is granted.

ENTER:

_____

Manish S. Shah
United States District Judge

Date: 4/10/2017

15